**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-1328

_____

REED C. DEMPSEY;
SHELLEY DEMPSEY

v.

BUCKNELL UNIVERSITY;  JOHN C. BRAVMAN;
LEWIS A. MARARRA;  DANIEL C. REMLEY;
AMY A. BADAL; LINDA LOCHER; KARI M. CONRAD;
MICHAEL SMYER; CHIEF JASON FRIEDBURG;
OFFICER JULIE HOLTZAPPLE;
OFFICER DARRELL FISHER;
OFFICER ROBERT ULMER;
OFFICER JAMES MIDDLETON; OFFICER JED RISHEL;
DETECTIVE JEFFREY ETTINGER;
CAPTAIN DOUGLAS LAUVER;  ANTHONY J. VOCI, JR.

Reed C. Dempsey,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No. 4-11-cv-01679)
District Judge:  Honorable Matthew W. Brann

_____

Argued:  January 26, 2016

Before:   VANASKIE, SHWARTZ, and KRAUSE, *Circuit Judges*

(Opinion Filed: August 22, 2016)
_____

Dennis E. Boyle, Esq. [ARGUED]
Kenneth E. Raleigh, Esq.
Fox Rothschild
1030 15th Street, N.W.
Suite 360 East
Washington, DC 20005

*Counsel for Appellants*

Amy C. Foerster, Esq.
Bucknell University
217A Marts Hall
Lewisburg, PA 17837

James A. Keller, Esq. [ARGUED]
Saul Ewing
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

Cory S. Winter, Esq.
Saul Ewing
Two North Second Street
Penn National Insurance Tower, 7th Floor
Harrisburg, PA 17101

*Counsel for Appellees*

———————————

OPINION OF THE COURT

———————————

KRAUSE, *Circuit Judge*.

Reed Dempsey brought a civil rights action under 42 U.S.C. § 1983 against Bucknell University, Bucknell University Public Safety ("BUPS")[1] officers, and Bucknell University officials (collectively, the "Bucknell Defendants") claiming violations of his Fourth Amendment right to be free from unlawful search and seizure. Because we agree with the District Court that, even taking into account certain facts recklessly omitted from the affidavit of probable cause, a reasonable jury could not find a lack of probable cause, we will affirm the District Court's grant of summary judgment in favor of the Bucknell Defendants.

I.     **Background**

---

[1] Although Bucknell University is a private institution, BUPS officers are sworn police officers pursuant to 22 Pa. Cons. Stat. § 501. For this reason, their official actions are taken "under color of state authority" for purposes of § 1983. *Henderson v. Fisher*, 631 F.2d 1115, 1118-19 (3d Cir. 1980).

## A. Factual History

On Sunday, September 5, 2010, BUPS officer Julie Holtzapple received a phone call from the father of a nineteen-year-old Bucknell undergraduate, Kelly Stefanowicz, reporting that she had been assaulted by a fellow student, Reed Dempsey, on campus in the early hours of that day. Officer Holtzapple requested that Stefanowicz come to the BUPS office to speak with her and other officers about the incident, which Stefanowicz did. In that interview, Stefanowicz gave a detailed account of the incident. She explained that, after a night out during which both she and Dempsey had consumed alcohol, the two began playfully "wrestling," first in Kelly's room, then in the hallway of their shared residence hall, and finally in Dempsey's room, where other students were gathered. J.A. 322. When the other students left the two alone, Dempsey "picked [Stefanowicz] up and . . . put [her] on the futon" in his room, got on top of her, and put her hands over her head. J.A. 322. Stefanowicz told the officers that Dempsey "was . . . getting off to it" and that "he was . . . hard to it." J.A. 327. She stated that they then struggled on the futon, and she "br[oke] free from him" and ran into the hall where other students were gathered. J.A. 322. Stefanowicz explained that when she entered the hall, she was laughing because she was out of breath and "in shock," but that when Dempsey caught up to her in the hall she "five-starred [i.e., slapped,] him right across the face" and told him to "leave [her] alone" in front of the other students. J.A.322, 324. She reported that as she was walking away from him, he grabbed both of her arms, causing her to fall, and "tackled" her to the ground, where she struggled, sustaining large scrapes and bruises to her face and shoulder, which were visible to the officers who interviewed her. J.A.

4

324. She told the officers that she also had marks and bruises in several other places, including her "inner thigh," "butt," and "boobs," as a result of the incident. J.A. 324-25.

Stefanowicz also recounted in this interview that after she had returned to her room, her resident advisor ("R.A."), a fellow Bucknell undergraduate, came by her room, asked her if she was going to file a report, and "kind of just . . . laughed." J.A. 325. She then showed the interviewing officers three text messages that she had received from Dempsey after the incident: one at 2:43 AM that read, "Sorry…I'm bleeding in several places and bruises all over…but that was unnecessary on my part"; one at 3:35 AM that read, "I honestly feel horrible…I'm so sorry"; and one at 5:11 PM that read, "Are you alright?" J.A. 335. Following the interview, Stefanowicz went to a nearby hospital for a medical examination in which staff noted injuries to her "head," "chest," and "right lower extremity" and took photographs documenting these injuries. J.A. 851.

That same day, another BUPS officer contacted Dempsey, who agreed to meet for an interview regarding the incident. Dempsey gave the interviewing officers a written statement he had prepared, as well as an oral interview.[2] As reflected in the incident report, Dempsey told the officers that after a night out with friends, he returned to his residence hall, that he and Stefanowicz "started wrestling around in [Dempsey's] room," as they had done in the past, and that "it started to get more intense and Stefanowicz punched him in

_____

[2] The record on appeal contains neither a copy of this written statement nor a transcript of the interview. The only documentation of these statements appears in a summary entered into the BUPS incident report.

5

the groin." J.A. 268. According to Dempsey, although his roommate, Wade Payson-Denney, and his roommate's friend, Gabriela Ors, were in the room with them "pretty much the whole time," there was a period of "about a minute" during which he and Stefanowicz were alone in the room, and "that is when he got punched in the groin." J.A. 268. Dempsey stated that Stefanowicz then got up and went into the hallway, and he followed her and "asked her to come back and she wouldn't so he caught up to her and . . . placed his arms around her and gave her a bear hug," causing the two of them to fall forward. J.A. 268. Dempsey explained that at that time he expressed concern "that he hurt her and that he would be in trouble," and Stefanowicz told him "she was not going to press charges or get him in trouble." J.A. 268. Dempsey reported, however, that "[a]fter everything started to die down . . . Stefanowicz would walk by him and either slap or punch him in the back to try and get him going again." J.A. 268-69. Dempsey stated that at that point, he "went back to his room and stayed there the rest of the night." J.A. 269.

Following the leads from Stefanowicz's and Dempsey's interviews, BUPS obtained written statements from a number of people who had witnessed parts of what occurred first-hand or had spoken to Stefanowicz or Dempsey soon after the incident. These included, among others, fellow Bucknell undergraduates Morgan Slade, Demitri Carahalios, Wade Payson-Denney, Gabriela Ors, Kristen Brundage, Gregory Fast, Raina Masand, Andrew Watts, Rebecca Neubauer, and Stefanowicz's R.A., Michael Sena. BUPS also obtained a written statement from Stefanowicz recounting the incident.

Based on this evidence, on September 7, 2010, BUPS filed a criminal complaint, accompanied by an affidavit of

6

probable cause signed by Officer Holtzapple, charging Dempsey with simple assault, harassment, and disorderly conduct in violation of Pennsylvania law. On the basis of that complaint and affidavit, the magistrate issued a warrant, and Dempsey was arraigned that same day. The affidavit provided the following distillation of the results of the BUPS officers' investigation into the incident[3]:

> On Sunday, September 5, 2010 at approximately 1957 hours, Officer Darrel Fisher, Officer Robert Ulmer and Officer Jule Holtzapple, all are officer's currently with the Bucknell University Department of Public Safety/ Police Department, spoke with Kelly Stefanowicz.
>
> Kelly Stefanowicz interview is as follows:
>
> On Sunday, September 5, 2010, at approximately 0200 hours, Kelly walked home with two of her friends, Morgan Slade and Demitri Carahalios, to her room, 166 Smith Hall, Bucknell University, Lewisburg Pa. 17837.
>
> Before entering her room, Kelly had pointed at Reed Dempsey. Reed then proceeded into Kelly's room and hung out with Kelly, Morgan, and Dimitri. Kelly stated that Reed and she began to wrestle playfully in her room. Kelly

---

[3] The affidavit is reprinted without typographical corrections.

7

stated she was not intimidated by Reed at this time and believed wrestling to be playful.

Kelly stated that after a short time Reed had picked her up and carried her over his shoulder. Reed Dempsey carried Kelly Stefanowicz into his room, which is Smith 138, Bucknell University, Lewisburg Pa. 17837.

Two people were in Reed's room at this time, roommate Wade Payson-Denny and Gregory Fast. Kelly stated that Reed put her down from carrying her and sat her on his lap. Reed would not release Kelly from his lap and held her down, making her sit on his lap.

Kelly stated shortly after this happened, both Wade Payson-Denny and Gregory Fast left Reed Dempsey room. Reed's room door shut automatically, after both men left the room.

Kelly stated that at this time she no longer felt safe around Reed. Kelly stated that Reed's behavior had turned instantly. It was at this time that Reed picked Kelly up from sitting on his lap and threw her onto a futon in the room. Reed laid on top of Kelly keeping her from sitting up. Kelly stated she attempted to push Reed off of her. He grabbed both of Kelly's hands and held them forcefully above her head. Kelly stated that Reed's penis was now erect under his clothes. He was on top of her and pinning her to the futon. Kelly believes that Reed was excited and that he was in total

8

control of her. Kelly began to yell at Reed "to get off of me" and "just stop it." She was in fear of getting raped by Reed. Kelly was able to release one of her hands and slapped Reed across the face. Kelly and Reed then rolled off of the futon, falling to the floor.

It was at this time that Kelly fell to the ground and landed on top of Reed. Kelly was able to get off of the ground, open the closed door, and run out into the hallway.

As she was walking away from Reed, and ignoring him, as he was calling for her to come back into his room. Kelly stated that people in the hallway were laughing at Reed and making fun of him because Kelly had turned him down in his room.

Reed next grabbed Kelly's arm and began to pull on it. Kelly attempted to get away from Reed by pulling away from him. Reed then grabbed both of Kelly's arms and held them behind him. Reed then fell onto Kelly, causing her to fall to the floor, landing on the left side of her face and also her right shoulder. Reed then stood up. Kelly then proceeded to her room, 166 Smith Hall, Bucknell University, to end this encounter.

Kelly displayed text messages from Reed following this incident. Text messages were sent at 0243 hours, 0335 hours, and 0511 hours. Photographs were taken of messages on phone

9

from Reed. These messages related to remorse for this incident and he was checking on her welfare.

Kelly Stefanowicz wants to proceed with criminal charges in this case. Medical treatment was obtained at Evangelical Community Hospital, 1 Hospital Drive, Lewisburg Pa. 17837. Photographs and medical report will be obtained on Wednesday, September 8, 2010.

J.A. 452-53.

After Dempsey's initial arraignment, BUPS officers continued to investigate the case. In her September 5 interview, Stefanowicz had told the officers that she was aware of an earlier incident between Rebecca Neubauer, another Bucknell undergraduate, and Dempsey, where Neubauer was "extremely intoxicated" and Dempsey "t[ook] advantage of her." J.A. 324. Following up on this information, Officer Holtzapple interviewed Neubauer on September 8. In that interview and a written statement, Neubauer indicated that Stefanowicz's version of events was not the "full story" and that she had "nothing to speak about that would be relevant to Kelly's incident." J.A. 275.

On September 9, BUPS officers conducted a second interview with Stefanowicz in which she discussed in greater detail the sexual component of the alleged assault against her. The following day, BUPS officers filed a second criminal complaint adding indecent assault and false imprisonment charges against Dempsey. The affidavit of probable cause was substantially the same.

10

After Dempsey's arraignment on the additional charges, BUPS officers continued to gather information related to the allegations, including a second statement by Gregory Fast. Specifically, the BUPS incident report reflects that following his written statement on September 5, Fast gave an interview on September 12 in which he stated that he saw Dempsey and Stefanowicz "on a futon wrestling" and that Stefanowicz "appeared as if she was trying to pin Dempsey." J.A. 284. The incident report also suggests, based on this statement, that Fast may have entered the room while Dempsey and Stefanowicz were alone.

On October 29, 2010, the District Attorney of Union County, Pennsylvania, Peter Johnson, withdrew all the charges against Dempsey. In a statement reported by a local news outlet, Johnson explained that "[t]he nature of the alleged crime and the surrounding circumstances make it difficult to prove what happened beyond a reasonable doubt." J.A. 535.[4]

## B. Procedural History

On September 6, 2011, nearly a year after the incident, Dempsey and his mother, Shelley Dempsey, brought suit against the Bucknell Defendants in the United States District Court for the Middle District of Pennsylvania under 42 U.S.C. § 1983. In their 18-count complaint, the Dempseys

---

[4] Prior to the withdrawal of the criminal charges, Stefanowicz and Dempsey initiated student conduct proceedings against each other pursuant to Bucknell University's internal procedures. As a result of those proceedings, both were found guilty of disorderly conduct.

11

asserted claims of false arrest, malicious prosecution, false imprisonment, supervisory liability, and violations of Title IX, as well as accompanying civil conspiracy and state law tort and breach of contract claims against the Bucknell Defendants. The District Court dismissed nine of these claims and then, after discovery, granted summary judgment to the Bucknell Defendants on the remaining claims.[5] *Dempsey v. Bucknell Univ.*, 76 F. Supp. 3d 565, 570 (M.D. Pa. 2015), *amended in part*, No. 4:11-CV-1679, 2015 WL 999101 (M.D. Pa. Mar. 6, 2015).

On appeal, Dempsey contends that the District Court erred in granting summary judgment on his false arrest, malicious prosecution, false imprisonment, and supervisory liability claims. Specifically, he argues that although the District Court properly determined that Officer Holtzapple recklessly omitted information from the affidavit of probable cause supporting the criminal complaint against Dempsey, the District Court incorrectly concluded that the omitted

---

[5] In the same complaint, the Dempseys also brought a claim of defamation against Anthony Voci, an attorney acting on behalf of the Stefanowiczs, based on statements he made to the media and to Bucknell University officials. The District Court denied summary judgment on that claim, but determined that "[t]he claims against the Bucknell Defendants and Defendant Voci do not raise the same legal questions, nor do they depend upon proof of the same facts." *Dempsey v. Bucknell Univ.*, No. 4:11-CV-1679, 2015 WL 999101, at *2 (M.D. Pa. Mar. 6, 2015). Accordingly, the District Court entered a final judgment pursuant to Fed. R. Civ. P. 54(d) as to the claims against the Bucknell Defendants only, and thus those are the only claims we may consider in this appeal.

12

information was not material to the probable cause determination. Because none of Dempsey's four claims survives if there was probable cause for the charges against him, our conclusion on that question is dispositive of this appeal.

## II.     **Jurisdiction & Standard of Review**

The District Court had jurisdiction over Dempsey's § 1983 claims pursuant to 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary. *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010). We will affirm the District Court only if we conclude "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must view the facts in the light most favorable to Dempsey, and he "is entitled to every reasonable inference that can be drawn from the record." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). We do not weigh the evidence; rather, we determine "whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Reedy*, 615 F.3d at 210. Thus, in this case, summary judgment is only appropriate if "a reasonable jury could not find a lack of probable cause." *See Montgomery v. De Simone,* 159 F.3d 120, 124 (3d Cir. 1998) (citing *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 191 (3d Cir. 1984)).

13

## III. Discussion

### A. Legal Standards

Before turning to the facts of the case at hand, we address the legal standards governing our inquiry: probable cause and the procedure district courts are expected to use when reviewing a probable cause determination underlying a warrant.

#### 1. Probable Cause

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. Far from demanding proof of guilt beyond a reasonable doubt, "[p]robable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)). Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). The probable cause standard thus provides individuals protection "against unreasonable searches and seizures," U.S. Const. amend. IV, while simultaneously enabling investigating officers to act quickly—before necessarily obtaining evidence sufficient to prove guilt beyond a reasonable doubt—to effect an arrest. "[T]he standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005).

14

As the Supreme Court has observed, "[i]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (alteration in original)). For this reason, the Court has eschewed "any rigid demand that specific 'tests' be satisfied" and has instead prescribed a "totality-of-the-circumstances approach" to the probable cause determination. *Id.* at 230-31. That determination is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed. *See Sherwood*, 113 F.3d at 401 ("Typically, the existence of probable cause in a section 1983 action is a question of fact." (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995))). Nevertheless, summary judgment may be granted on the question of probable cause if a court concludes that "the evidence, viewed most favorably to [the nonmoving party], reasonably would not support a contrary factual finding." *Id.*[6]

---

[6] We are satisfied that the District Court correctly identified and applied this high standard in reaching its decision, but we note that its citation of the standard for qualified immunity in the same discussion gives us pause. The qualified immunity standard inverts the standard applicable here, providing instead that "there can be no liability on the part of the arresting officer unless 'no reasonably competent officer' would conclude that probable cause existed." *Dempsey*, 76 F. Supp. 3d at 577 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Where, as in

15

There is a tension inherent in evaluating probable cause at the summary judgment stage. On the one hand, the summary judgment standard asks whether there is a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), viewing the evidence "in the light most favorable to the non-moving party," *Reedy*, 615 F.3d at 210. On the other hand, the probable cause standard by definition allows for the existence of conflicting, even irreconcilable, evidence. *See, e.g., Wright*, 409 F.3d at 603. In his brief on appeal, Dempsey urges us to resolve this tension by omitting from our consideration of probable cause any facts unfavorable to him that conflict with favorable facts. For example, as will be discussed further below, witness statements indicated that the time Dempsey and Stefanowicz were alone together was anywhere between one minute and ten minutes, but Dempsey argues that "in the light most favorable to Mr. Dempsey, the pair were alone for only one minute." Appellant's Br. 36-37.

We reject Dempsey's proposed approach. While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider. Instead, we view *all* such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability"

---

this case, the defendants have not pressed qualified immunity, that standard should play no role in a district court's determination of whether no reasonable jury could find a lack of probable cause such that summary judgment in favor of the defendant officers is appropriate.

16

that a crime occurred. Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate. Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

## 2. Reviewing a Probable Cause Determination

Dempsey contends that the affidavit sworn by Officer Holtzapple reflected a false version of events and that an accurate affidavit would not establish probable cause. To prevail on this claim, Dempsey must make two showings: first, that the officer, with at least a reckless disregard for the truth, "made false statements or omissions that create[d] a falsehood in applying for a warrant," and second, that those assertions or omissions were "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 786-87 (quoting *Sherwood*, 113 F.3d at 399).

An officer seeking a warrant on the basis of probable cause must follow a two-step process. First, the officer swears to an affidavit containing a summary of the events that she believes give rise to probable cause. In doing so, the officer "is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* at 790 (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)). Second, the officer presents the affidavit to a neutral magistrate, who conducts his own independent review of the evidence to determine whether it does, in fact, establish probable cause, and, if so, issues a warrant.

17

In this way, our system protects the public from the harm caused by criminals as well as the harm that would result if no process were required to obtain a warrant; it allows officers to pursue leads zealously while also ensuring that an arrest warrant will issue only if "a neutral and detached magistrate" agrees with the officer that probable cause exists. *Id.* at 787 ("[A]n uninterested party is presumably better suited to review and evaluate the facts than an officer pursuing a lead."); *see United States v. Leon*, 468 U.S. 897, 913-14 (1984) ("[T]he detached scrutiny of a neutral magistrate . . . is a more reliable safeguard [against Fourth Amendment violations] than the hurried judgment of a law enforcement officer . . . .") (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)). If, however, the officer does not provide the neutral magistrate with an accurate affidavit of probable cause, the protection afforded by the magistrate's review is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are.

In light of the far-reaching and lasting consequences associated with merely being arrested,[7] there is a critical need for faithful adherence to the process for establishing the existence of probable cause. Many settings in which allegations of criminal conduct arise will involve circumstances that make credibility determinations delicate

---

[7] For a recent scholarly work discussing the wide-ranging effects of an arrest, arising both inside and outside the criminal justice system, see Eisha Jain, *Arrests As Regulation,* 67 Stan. L. Rev. 809, 844 (2015) (noting as one example that "[a]rrested students whose identities are disclosed may be subject to lasting stigma").

and difficult. Those circumstances may include the involvement of alcohol, activities at unusual hours, and pre-existing relationships between alleged victims and alleged perpetrators residing in the same community—or even under the same roof. These considerations underscore how important it is, where exigencies do not require an immediate arrest, that officers undertake a careful investigation before making the serious decision to file a criminal complaint and that they include in the affidavit all information "'any reasonable person would know that a judge would want to know' in making a probable cause determination." *Reedy*, 615 F.3d at 213 (quoting *Wilson*, 212 F.3d at 783).

Nevertheless, in reviewing probable cause determinations made by law enforcement, the role of the courts is not that of the much-maligned "Monday morning quarterback" whose critiques are made possible only by the benefits of hindsight. Rather, federal courts review the record to ensure that the proper procedure for determining probable cause was followed. If it was not, the court itself must engage that procedure and determine whether probable cause existed in spite of that failure. As we have described in prior cases, in conducting this analysis, the district court must identify any improperly asserted or omitted facts and, if it determines there were reckless misrepresentations or omissions, "excise the offending inaccuracies and insert the facts recklessly omitted" from the affidavit and assess whether the reconstructed affidavit would establish probable cause. *Wilson*, 212 F.3d at 789. If it would, the plaintiff's claim fails because "even if there had not been omissions and misrepresentations" in the affidavit presented to the magistrate judge, there would have been probable cause for the charges against the plaintiff. *Id.*

19

Where there are improperly omitted or included facts, we have previously instructed district courts to perform literal, word-by-word reconstructions of challenged affidavits. *See id.* (discussing "reconstructive surgery required by our jurisprudence"); *Reedy*, 615 F.3d at 215 (noting "[t]he District Court's approach was correct" where it "reconstructed the Affidavit" being challenged). This reconstruction requirement facilitates review of the district court's determination as to the existence of probable cause. Recognizing, however, that our instruction has not been interpreted consistently as an explicit requirement, we now clarify that when a court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, it must perform a word-by-word reconstruction of the affidavit. [8]

In this case, although the District Court conducted the required two-step analysis for reviewing the probable cause determination, it did not perform a word-by-word reconstruction of the affidavit, or at least did not include any

---

[8] We recognize an exception to this requirement: There may be instances in which reconstruction of the entirety of an affidavit may be impracticable, e.g., as a result of the affidavit's extraordinary length. *See, e.g., Lavin v. N.Y. News, Inc.*, 757 F.2d 1416, 1417 (3d Cir. 1985) (discussing 165-page affidavit detailing results of an investigation of an organized crime operation). Where an affidavit is so long that a word-by-word reconstruction would do more to distract from than to clarify the court's holding, the court should instead identify with particularity the evidence that should be deleted or inserted and specify where precisely in the affidavit any alterations should appear.

such reconstruction in its decision. For efficiency's sake and illustrative purposes, we will conduct this reconstruction ourselves in this case rather than remand for the District Court to perform it in the first instance.

### B.     Analysis

We turn now to the merits of Dempsey's argument that the District Court erred in determining that although the officer recklessly omitted information from the affidavit of probable cause, there was nevertheless probable cause for the charges against Dempsey. We follow the three-step procedure we described in *Wilson* and *Reedy*. First, we assess the evidence the plaintiff asserts was recklessly omitted from the affidavit. Next, we reconstruct an affidavit that includes any recklessly omitted information. And finally, we assess the materiality of the omitted information to the probable cause determination.

### 1. Reckless Omissions

To determine whether information was recklessly omitted, we ask whether the officer withheld "a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). In doing so, we exercise "scrupulous neutrality"; we do not engage the "deliberately slanted perspective" we must use to make the ultimate determination as to whether summary judgment is appropriate. *Reedy*, 615 F.3d at 214 n.24.

Inherent in this inquiry are two requirements. First, the officer must have knowledge of the information alleged to have been recklessly omitted. For this reason, we look only to the information available to the officer at the time of the swearing of the affidavit of probable cause. Second, the information must be relevant[9] to the existence of probable

---

[9] Although we use the term "relevant," the recklessness inquiry could be understood to assess whether omitted information is "material," as District Judge Louis H. Pollak astutely observed in dissent in *Wilson*. 212 F.3d at 797 (Pollak, J., dissenting) ("It is . . . puzzling that the court appears to conclude both (1) that it would be unreasonable to keep the information from the judge, which would seem to suggest that it *could* make a difference to a probable cause inquiry, and (2) that it would be unreasonable to conclude that the information would have made a difference to probable cause."). The *Wilson* majority, however, concluded the recklessness inquiry asks only whether the omitted fact bears on probable cause such that it should be presented to the magistrate and does not answer the next question as to

cause. The relevance requirement "ensures that a police officer does not 'make unilateral decisions about the materiality of information'" by enabling a magistrate to decide independently, on the basis of an affidavit containing all relevant information, whether the circumstances give rise to probable cause. *Id.* at 213 (quoting *Wilson*, 212 F.3d at 787). At the same time, however, it recognizes that for practical reasons courts simply "cannot demand that police

---

whether it is material to, i.e., whether it would alter, the magistrate's ultimate determination as to the existence of probable cause. The *Wilson* approach is consistent with the requirement that a neutral magistrate, not an officer, make the ultimate probable cause determination: Even though the magistrate may agree with an officer that certain evidence is not material to probable cause, the officer must include that evidence if a reasonable person would know that it *could* affect the probable cause determination—a lower threshold of materiality. While the concept of materiality is applicable in both inquiries, the benchmark for materiality is different; at the first step, the recklessness inquiry, we consider whether the officer withheld "a fact in his ken that '[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know,'" *Wilson*, 212 F.3d at 788 (quoting *Jacobs*, 986 F.2d at 1235), while at the second step, the probable cause inquiry, we consider whether any such omissions were "necessary[] to the finding of probable cause," *id.* (quoting *Sherwood*, 113 F.3d at 399). Thus, for ease of reference we describe the recklessness inquiry as one that examines the relevance of the omitted information.

officers relate the entire history of events leading up to a warrant application." *Wilson*, 212 F.3d at 787.[10]

In his brief on appeal, Dempsey contends the following information was recklessly omitted from the affidavit of probable cause[11]:

---

[10] Indeed, in many cases it is not only appropriate but desirable for officers to provide the magistrate with a distilled version of the circumstances giving rise to probable cause. Our decision in this case does not call into question the common practice of relating those circumstances "in substance and in part," rather than in their entirety, in an affidavit of probable cause.

[11] Dempsey's brief on appeal provides his version of a reconstructed affidavit, as well as supporting discussion, from which we draw the information he contends was recklessly omitted. As we will explain, however, we cannot wholly accept Dempsey's version of the reconstructed affidavit. One reason for this is that his affidavit, in some places, does not accurately represent the witness statements as they appear in the record. For example, in two places in his brief, Dempsey indicates that Kristen Brundage stated she heard "laughing screams" from Dempsey's room, supporting his argument that the evidence reflected that the events in the room were clearly playful, Appellant's Br. 17, 32; in fact she stated she heard "laughing, screams, and crashing" from the room, J.A. 824, lending some support for Stefanowicz's assertion that the interaction went from "playful" to "scary" while the two were alone, J.A. 322. In another example, Dempsey's reconstructed affidavit states that "he and Kelly moved from his room to the hallway, when Kelly punched him in the

24

(1) statements from Morgan Slade, Demitri Carahalios, Wade Payson-Denney, Gabriela Ors, Kristen Brundage, Gregory Fast, and Raina Masand indicating Dempsey and Stefanowicz's interactions prior to the time they were alone in the room together were playful and consensual and that they had engaged in similar activities before;

(2) Gregory Fast's statement indicating that he observed Dempsey and Stefanowicz during the time Stefanowicz alleged they were alone in the room and saw Stefanowicz pinning Dempsey to the futon, not the opposite;

---

groin," suggesting Stefanowicz punched him in the groin in the hallway. Appellant's Br. 33-34. In his original statement to officers, however, Dempsey indicated that Stefanowicz punched him in the groin while the two were alone in the room and *then* left the room and entered the hallway. J.A. 268.

We will presume that any misrepresentations of record evidence (in both of the above-cited instances, as a result of a misplaced comma) were inadvertent, but we urge counsel to exercise the same level of care that we have urged upon the law enforcement officers who investigate allegations of criminal conduct. Of course, we conduct our analysis based on the evidence reflected in the record itself.

25

(3) Dempsey's statement to BUPS officers that he and Stefanowicz were alone together for "about a minute," J.A. 268;

(4) Kristen Brundage's statement that while she was in the hallway and Dempsey and Stefanowicz were alone in Dempsey's room, she heard "laughing, screams, and crashing" coming from the room, J.A. 824; and the fact that none of the witnesses who were in the hall heard Stefanowicz yelling at Dempsey in the room to "get off" her and "stop," as Stefanowicz had believed they would have, J.A. 324;

(5) statements from Kristen Brundage and Gregory Fast indicating Stefanowicz was laughing after leaving Dempsey's room and that the two were still playfully wrestling; Kristen Brundage's statement that "the playfighting went too far" and "[e]verytime Reed would walk away, Kelly would chase after him, insulting him and egging him on," J.A. 825; Gregory Fast's statement that the two had agreed to stop play wrestling when "Kelly slapped Reed in the face" and that "Reed contained Kelly and brought her to the ground even though she struggled and was hitting him," J.A. 438; and the R.A.'s statement that Stefanowicz was being aggressive toward Dempsey by, e.g., yelling profanities at him, and that it took physical effort to keep her away from Dempsey;

26

(6) Dempsey's statement that he did not intend to tackle Stefanowicz;

(7) Dempsey's statement that he was acting in self-defense when he fell on Stefanowicz;

(8) Stefanowicz's statements to Andrew Watts, Raina Masand, and Kristen Brundage expressing remorse for her role in escalating the encounter and her request to her R.A. that he not file a report;

(9) Dempsey's willingness to meet with officers regarding the incident;

(10) Stefanowicz's failure to state to any witness prior to her first interview with BUPS officers that Dempsey's "penis was erect" while they were on the futon, Appellant's Br. 32;

(11) Rebecca Neubauer's statement that "[a]nything that Kelly brings up" regarding an alleged sexual encounter between Neubauer and Dempsey "is not relevant at all to [Stefanowicz's] situation and incidence [sic]," J.A. 857.

The District Court concluded that the witness statements indicating that Stefanowicz and Dempsey were light-hearted and playful prior to being alone in the room and had engaged in similar activities before (Paragraph (1)); that Stefanowicz was laughing when they came back onto the hall (Paragraph (5)); and that she, and not Dempsey, was the aggressor in the hall (Paragraph (6)) were recklessly omitted

27

because they are relevant evidence of how the events reported in the affidavit unfolded and of Dempsey's state of mind. In addition, Dempsey urges that his statement that he and Stefanowicz were alone together for only "about a minute" (Paragraph (3)), reports from witnesses in the hall as to what they did and did not hear from the room when Stefanowicz and Dempsey were alone together (Paragraph (4)), and Stefanowicz's expressions of remorse to her friends and her action in asking her R.A. not to file a report (Paragraph (8)) are pieces of information a reasonable person would know a magistrate would want to know given their relevance to Stefanowicz's allegations of assault and the circumstances in which she sustained injuries.[12]

After careful review, we agree that, in the context of this case and the allegations that were included in the affidavit, the information in these paragraphs was relevant to the probable cause determination and thus should be included in a reconstructed affidavit for purposes of a materiality analysis. In so concluding, we emphasize that our determination as to the relevance of these statements is necessarily specific to the record before us, informed both by the facts of the case and the allegations set forth in the affidavit of probable cause, and does not indicate that there are categories of statements that as a rule must be included. Rather, we ask in the context of a given case whether "any reasonable person would know that a judge would want to

---

[12] The Bucknell Defendants seem to agree that the time the two were alone is relevant. *See* Appellee's Br. 12 n.2 ("[T]he amount of time Reed and Ms. Stefanowicz spent alone in Reed's bedroom is of course relevant . . . .").

know" a particular statement in making a probable cause determination, *Wilson*, 212 F.3d at 783,[13] and in the context of this case, answer in the affirmative as to Paragraphs (1), (3), (4), (5), (6), and (8).

We are not so persuaded as to the remaining pieces of information cited by Dempsey. Some of that information simply was not known to Officer Holtzapple, or any other officer, prior to either instance in which she swore the affidavit of probable cause. For example, Gregory Fast's statement indicating that he entered the room during the time Stefanowicz alleged she and Dempsey were alone together and saw Stefanowicz pinning Dempsey to the futon (Paragraph (2)) was received on September 12, after both affidavits of probable cause had been sworn. J.A. 284. In his September 5 statement, Fast stated only that he saw them "playfully wrestling on the futon" but then left the room and did not see them emerge for "10-minutes give-or-take." J.A. 438. Likewise, while Dempsey told police on September 5

---

[13] Moreover, and as is clear from our discussion in footnote 9, *supra*, at this point in our analysis we do not assess whether the recklessly omitted information was in fact material to probable cause when considered in combination with the other evidence reflected in the affidavit. Nor does a determination that information was recklessly omitted necessarily mean that an officer acted in bad faith. To the contrary, as officers engage "in the often competitive enterprise of ferreting out crime," *Wilson*, 212 F.3d at 787 (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)), and draw on their own experience and expertise to assess witnesses and evidence in an investigation, they may at times omit information recklessly but in good faith.

that he did not intend to injure Stefanowicz, the record on appeal reflects that he did not claim he was acting in self-defense (Paragraph (7)) until his deposition in 2013, at which time he stated that she "hit [him] in the genitals" while the two were in the hall and "[t]o avoid her doing so again, [he] reached [his] arms around her as she kind of turned around," resulting in both falling to the ground. J.A. 798-99. Thus, we will not include either of these statements in the reconstructed affidavit.

Some of this information was not recklessly omitted because it is not information "'any reasonable person would know that a judge would want to know' in making a probable cause determination." *Reedy*, 615 F.3d at 213 (quoting *Wilson*, 212 F.3d at 783). For instance, Dempsey's cooperation with law enforcement (Paragraph (9)) is not relevant because cooperation may merely reflect a person's erroneous belief that he has not committed a crime, *see Heien v. North Carolina*, 135 S. Ct. 530, 540 (2014) (discussing the "well-known maxim, '[i]gnorance of the law is no excuse[]'"), or may stem from savvy or hubris rather than a "clean conscience," *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) (concluding "cooperation did not negate the risk," established by other evidence, that suspect was armed).

In addition, the fact that Stefanowicz does not appear to have told anyone prior to her first interview with police that Dempsey's "penis was erect," Appellant's Br. 32, while he pinned her to the futon (Paragraph (10)) was not recklessly omitted because it has limited significance in view of statements Stefanowicz did make, according to two witnesses. Although it is true that the record does not reflect that Stefanowicz used those precise words prior to her interview

30

with police, it does reflect that she told Raina Masand immediately after the incident that "Reed pushed her onto the ground and tried to take advantage of her." J.A. 435. Kristen Brundage also reported that Stefanowicz told her immediately after the incident that "Reed had tried to 'take advantage of her.'" J.A. 825. These statements are sufficient to demonstrate that Stefanowicz's first report of the incident described the assault as having a sexual dimension. We therefore will not include this information in the reconstructed affidavit.

Similarly, Rebecca Neubauer's statement (Paragraph (11)) was not recklessly omitted because it has no relevance to the probable cause determination. Rather than contradicting Stefanowicz's statement that something had occurred between Dempsey and Neubauer, Neubauer's statement appears to confirm there had been some interaction and to add only that, according to Neubauer, Stefanowicz did not know the whole story and Neubauer considered it "not relevant at all." J.A. 857. Because it is not relevant, this statement also will not be included in the reconstructed affidavit.

### 2. Reconstructed Affidavit for Materiality Analysis

In the normal course, the next step of our analysis would be to reconstruct the affidavit, including the recklessly omitted information, so that we may proceed with a materiality analysis. In some cases, however, there will be other information in the record that gives context to or affects the weight to be accorded the recklessly omitted information, such that it also should be considered by the reviewing court in determining materiality.

31

We faced such a situation in *United States v. Frost*, where we evaluated an affidavit of probable cause underlying a search warrant for a suitcase. 999 F.2d 737 (3d Cir. 1993). The criminal defendant there alleged that the affidavit recklessly omitted the fact that a drug-sniffing dog had not gone into alert upon sniffing the suitcase. *Id.* at 743. The officer who swore the affidavit testified, however, that he believed the dog's failure to alert was a "neutral factor" in the probable cause analysis because drug couriers often use "scent masking" techniques to avoid detection. *Id.* Without deciding whether the omission of that information was reckless, we concluded that "the relevant issue [was] whether the . . . affidavit would have provided probable cause if it had disclosed the information concerning the dog's sniffing of the suitcase, including the information about 'scent masking' that [the officer] knew and would have included to enable the magistrate to evaluate the dog's failure to alert. Only an evaluation of the affidavit so supplemented will reveal whether there is a causal connection between [the officer's] failure to disclose and [probable cause]." *Id.* at 743. *Frost* teaches that where additional information in the record bears on the materiality of the recklessly omitted information to probable cause, that additional information also should be included the reconstructed affidavit.

Such is the case here. For example, with regard to the witness statements indicating that the two were playful before and after being alone together and that Stefanowicz was the aggressor in the hall (Paragraphs (5) and (6)), it is also relevant to the probable cause determination that Stefanowicz herself told officers she was laughing when she reentered the hall from Dempsey's room and that it was because she "was in shock," J.A. 322, and that while Gregory Fast reported that

32

Dempsey fell on Stefanowicz while trying to "contain her," i.e., to keep her from hitting him again, Dempsey had reported to officers that "he asked her to come back" when she left the room and when she wouldn't, "he caught up to her and . . . placed his arms around her and gave her a bear hug," causing the two to fall forward, J.A. 268. With regard to the statements pertaining to the time the two were alone (Paragraphs (3) and (4)), it is also relevant that Gregory Fast stated that he believed it was about ten minutes between when he left the room and when the two exited. Because this information bears on the weight a magistrate would accord the recklessly omitted statements in making the ultimate determination as to probable cause, we will also include this information in the reconstructed affidavit.

An affidavit reconstructed to include both the recklessly omitted information and the other information that gives it context would read as follows:

> On Sunday, September 5, 2010 at approximately 1957 hours, Officer Darrel Fisher, Officer Robert Ulmer and Officer Jule Holtzapple, all are officer's currently with the Bucknell University Department of Public Safety/ Police Department, spoke with Kelly Stefanowicz.
>
> **[The investigation revealed evidence]** as follows:
>
> On Sunday, September 5, 2010, at approximately 0200 hours, Kelly walked home with two of her friends, Morgan Slade and Demitri Carahalios, to her room, 166 Smith

Hall, Bucknell University, Lewisburg Pa. 17837.

Before entering her room, Kelly had pointed at Reed Dempsey. Reed then proceeded into Kelly's room and hung out with Kelly, Morgan, and Dimitri. Kelly stated that Reed and she began to wrestle playfully in her room. Kelly stated she was not intimidated by Reed at this time and believed wrestling to be playful. **[Witnesses stated that they had play wrestled before.]**

Kelly stated that after a short time Reed had picked her up and carried her over his shoulder. Reed Dempsey carried Kelly Stefanowicz into his room, which is Smith 138, Bucknell University, Lewisburg Pa. 17837. **[Witness Kristen Brundage stated that she saw Reed carrying Kelly, who was laughing and hitting him on the butt with a shoe.]**

Two people were in Reed's room at this time, roommate Wade Payson-Denny and Gregory Fast. Kelly stated that Reed put her down from carrying her and sat her on his lap. Reed would not release Kelly from his lap and held her down, making her sit on his lap. **[Witness Gabriela Ors recounted being in Reed's room for about ten minutes, and that the situation never seemed violent. Witness Wade Payson-Denney said that he saw Kelly and Reed in the room jokingly wrestling on the floor.]**

Kelly stated shortly after this happened, both Wade Payson-Denny and Gregory Fast left Reed Dempsey room. Reed's room door shut automatically, after both men left the room.

Kelly stated that at this time she no longer felt safe around Reed. Kelly stated that Reed's behavior had turned instantly. It was at this time that Reed picked Kelly up from sitting on his lap and threw her onto a futon in the room. Reed laid on top of Kelly keeping her from sitting up. Kelly stated she attempted to push Reed off of her. He grabbed both of Kelly's hands and held them forcefully above her head. Kelly stated that Reed's penis was now erect under his clothes. He was on top of her and pinning her to the futon. Kelly believes that Reed was excited and that he was in total control of her. Kelly began to yell at Reed "to get off of me" and "just stop it." She was in fear of getting raped by Reed. Kelly was able to release one of her hands and slapped Reed across the face. Kelly and Reed then rolled off of the futon, falling to the floor. [**Although Kelly stated she believed people must have heard her, no witnesses reported hearing these exact words. Witness Kristin Brundage stated, however, that when Kelly and Reed were alone in the room she heard "laughing, screams, and crashing." Reed stated he believed they were alone in the room for about a minute, while Gregory**

**Fast's statement indicates they were alone for about ten minutes.]**

It was at this time that Kelly fell to the ground and landed on top of Reed. Kelly was able to get off of the ground, open the closed door, and run out into the hallway. **[Although Reed's story corroborated Kelly's that she left the room before him, other witnesses in the hall indicated that the two "came out wrestling. It seemed like play wrestling, with laughing and goofy insults." Kelly stated that she was laughing when she came onto the hall because she "was in shock."]**

As she was walking away from Reed, and ignoring him, as he was calling for her to come back into his room. Kelly stated that people in the hallway were laughing at Reed and making fun of him because Kelly had turned him down in his room.

Reed next grabbed Kelly's arm and began to pull on it. Kelly attempted to get away from Reed by pulling away from him. Reed then grabbed both of Kelly's arms and held them behind him. Reed then fell onto Kelly, causing her to fall to the floor, landing on the left side of her face and also her right shoulder. Reed then stood up. **[Witness Gregory Fast reported that after a mutual agreement to stop play wrestling Kelly slapped Reed in the face, and only then did Reed fall on Kelly in an attempt to contain her. Reed, however, did**

**not report that she slapped him and he was trying to contain her when he fell on her, stating instead that he asked her to come back after she left his room and placed his arms around her and gave her a bear hug, accidentally falling on her.]** Kelly then proceeded to her room, 166 Smith Hall, Bucknell University, to end this encounter. **[Witness Kristen Brundage stated, however, that "every time Reed would walk away, Kelly would chase after him, insulting him and egging him on." R.A. Michael Sena reported that when he came onto the hall, after the fall, Kelly was yelling profanities at Reed and it took some effort on the R.A.'s part to contain her. He also reported that Kelly told him that she and Reed were just playing around and asked him not to file a report that night.]**

Kelly displayed text messages from Reed following this incident. Text messages were sent at 0243 hours, 0335 hours, and 0511 hours. Photographs were taken of messages on phone from Reed. These messages related to remorse for this incident and he was checking on her welfare. **[Kelly also expressed remorse for her role in escalating the encounter to Witnesses Andrew Watts, Raina Masand, and Kristen Brundage.]**

Kelly Stefanowicz wants to proceed with criminal charges in this case. Medical treatment was obtained at Evangelical Community

Hospital, 1 Hospital Drive, Lewisburg Pa. 17837. Photographs and medical report will be obtained on Wednesday, September 8, 2010.

### 3. Materiality

We turn now to the question whether the recklessly omitted statements, considered in the context of the affidavit as a whole, were omissions "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 787 (quoting *Sherwood*, 113 F.3d at 399). To affirm the District Court's grant of summary judgment, we must conclude that "no reasonable jury could find facts that would lead to the conclusion" that the reconstructed affidavit "lacked probable cause." *Id.* at 792.

Dempsey was charged with simple assault, harassment, disorderly conduct, indecent assault, and false imprisonment. Because probable cause exists where there is merely a "fair probability" that the arrestee committed a crime, we need not identify "the same type of specific evidence of each element of [an] offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). In light of the fact that Dempsey has pressed his malicious prosecution claim on appeal, however, we will assess whether any reasonable jury could find a lack of probable cause as to any of the five crimes charged against him, bearing in mind that although false arrest or imprisonment claims will necessarily fail if probable cause existed for any one of the crimes charged against the arrestee, "probable cause on one charge does not foreclose a *malicious prosecution* cause of action" based on additional charges for which there was no probable cause. *Johnson v. Knorr*, 477 F.3d 75, 83 (3d Cir. 2007) (emphasis added). In the case of

38

prosecution, unlike arrest, unfounded charges "almost surely will place an additional burden on the defendant," and thus we must consider probable cause as to each of the charges. *Id.* at 84.

In assessing whether the reconstructed affidavit establishes probable cause, we also must bear in mind our Circuit's rule that statements of a victim witness are typically sufficient to establish probable cause in the absence of "[i]ndependent exculpatory evidence or substantial evidence of [a] witness's own unreliability" that "outweigh[s]" the probable cause that otherwise exists. *Wilson*, 212 F.3d at 790; *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest."). Applying this principle, we have held that no reasonable jury could find a lack of probable cause where a victim identified the arrestee in a photo array, but other evidence suggested the perpetrator was significantly taller than the arrestee, a different victim did not identify the arrestee, and another witness claimed to have seen the arrestee at the time of the crime, *Wilson*, 212 F.3d at 791-92, and where a victim first identified a different person as her assailant before changing her story to identify the arrestee, *Sharrar*, 128 F.3d at 818-19. Thus, some "unreliability or exculpatory evidence" will not "fatally undermine[]" probable cause otherwise established. *Wilson*, 212 F.3d at 790.[14]

---

[14] Dempsey cites a Sixth Circuit case, *Wesley v. Campbell*, which declared that "[i]t is well-settled that evidence contradicting even part of a witness's allegations seriously undermines their reliability and can defeat probable

39

With these principles in mind, we turn to the reconstructed affidavit.

### a.    Evidence Supporting Probable Cause

We first address Dempsey's threshold argument that the evidence cited by the District Court—Stefanowicz's multiple statements and Raina Masand's statement corroborating in large part her version of events; the photographs of Stefanowicz's injuries, taken immediately following the incident and the next day during the medical examination; and the text messages sent by Dempsey to Stefanowicz in the hours following the incident—does not give rise to probable cause that he committed the crimes of simple assault, harassment, disorderly conduct, indecent assault, and false imprisonment.

First, Dempsey argues that Stefanowicz's multiple statements, as well as Raina Masand's corroborating statement, are "prior inconsistent statements" and that a jury should have been allowed to decide whether Stefanowicz "merely added detail or, in fact, changed her story."

cause." 779 F.3d 421, 435 (6th Cir. 2015). As should be clear from our discussion of *Sharrar v. Felsing* and *Wilson v. Russo*, this statement from the Sixth Circuit does not reflect the law of our Circuit. Furthermore, *Wesley* involved a set of facts in which there was no physical evidence of alleged repeated abuse and there were myriad reasons to believe that the victim witness was thoroughly unreliable; it is far from clear that *Wesley* would dictate the result Dempsey advocates on the facts presented in this case.

Appellant's Br. 40. We disagree. The fact that Stefanowicz gave multiple accounts of the incident is, without more, not exculpatory; she did so at the request of law enforcement officers, suggesting that Stefanowicz was simply acting as a cooperative witness, not that she was seeking opportunities to change her story to implicate Dempsey in more serious offenses. Furthermore, Dempsey has pointed us to no specific inconsistencies in Stefanowicz's statements to law enforcement and her friends, other than those we have already addressed and concluded were not inconsistencies at all. *See supra* Part III.B.1 (addressing Dempsey's argument that Stefanowicz did not describe the incident as having a sexual dimension until she related her version of events to BUPS officers).

Second, Dempsey asserts that the photographs "proved only that Ms. Stefanowicz was injured in some way" and, in any event, "do not depict injuries consistent with the vicious attack Kelly alleged." Appellant's Br. 41. We again disagree. Stefanowicz described an assault in which Dempsey aggressively touched her, including pinching and punching, first during play wrestling and then against her wishes while the two were alone and, in the hallway, "tackled" her, leading to injuries to her face and shoulder. J.A. 324. The photographs taken during the medical examination revealed injuries to Stefanowicz's "chest" and "right lower extremity." J.A. 851; S.A. 42-47. Furthermore, the record clearly reflects that the injuries to her face and shoulder were sustained as a result of her falling in the hallway: Pictures documenting those injuries were taken immediately after the incident, S.A. 1-6, and Raina Masand, Kristen Brundage, and R.A. Michael Sena all reported

observing injuries to Stefanowicz's face at that time. This evidence is consistent with Stefanowicz's allegations.

Finally, Dempsey contends that while his text messages to Stefanowicz "could demonstrate remorse, they just as logically show an attempt to diffuse a heated situation between friends." Appellant's Br. 42. Even assuming we agree with Dempsey that his text messages could be understood that way, they nevertheless demonstrate that at the very least, he was a party to what he viewed as a "heated situation."

Mindful that the question we must ask at this stage is whether "a reasonable jury could not find a lack of probable cause," *Montgomery*, 159 F.3d at 124, i.e., that the evidence gives rise to a "fair probability" that Dempsey committed the crimes alleged, *Wilson*, 212 F.3d at 789 (quoting *Sherwood*, 113 F.3d at 401), we conclude that Stefanowicz's and Masand's statements, the documented injuries, and the text messages establish probable cause, and that no reasonable jury could come to a contrary conclusion.

### b. Evidence Undermining Probable Cause

Having determined that inculpatory evidence, reflected in the reconstructed affidavit, gives rise to probable cause for each of the five crimes charged against Dempsey, the question remaining is whether there is "[i]ndependent exculpatory evidence or substantial evidence of [Stefanowicz's] own unreliability" that "outweigh[s]" the probable cause otherwise established by the affidavit of probable cause. *Id.* at 790. The reconstructed affidavit reflects two categories of recklessly omitted information that,

42

Dempsey submits undermines probable cause: witness statements contradicting Stefanowicz's version of events and evidence of the amount of time the two were alone together. In light of the evidence corroborating in substantial part Stefanowicz's story and the existence of a period of time in which no one disputes the two were alone together in Dempsey's room, we conclude that even considering the recklessly omitted information, no reasonable jury could determine that the affidavit lacked probable cause.

### i. Witness Statements

Dempsey contends that omitted witness statements indicating that the interaction between Stefanowicz and Dempsey was playful and, when it was not playful, Stefanowicz was the aggressor, are material to the probable cause determination because they "contradicted Ms. Stefanowicz's story in striking ways." Appellant's Br. 38.

First, he argues that while Stefanowicz says she yelled at Dempsey while they were alone in his room, "not one of the witnesses in the hall heard Ms. Stefanowicz yell stop, but instead reported hearing playful noises." *Id.* But this contention is not supported by the record evidence. In fact, Kristen Brundage stated that she heard "laughing, *screams*, and crashing" coming from the room. J.A. 824 (emphasis added). Far from contradicting Stefanowicz's story, it is largely consistent, not inconsistent, with her assertion that she struggled against Dempsey, as well as with her statements indicating that her interaction with Dempsey "immediately transitioned from 'funny' and 'joking' to 'scary' and 'dark'" when the two were left alone in Dempsey's room. J.A. 445.

43

Second, Dempsey avers that "the eye witnesses almost unanimously agreed that Ms. Stefanowicz and not Mr. Dempsey was the aggressor." Appellant's Br. 39. This statement is true as to what witnesses observed in the hallway after the two had emerged from the room, but it does not explain what happened while the two were in the room. Furthermore, Stefanowicz herself told officers that she slapped Dempsey "right across the face" while the two were in the hallway; in that sense, her story—that when they left the room, she was aggressive toward Dempsey—is consistent with that of the witnesses in the hall. J.A. 324. Bearing in mind that probable cause "does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate," *Wright*, 409 F.3d at 603, we conclude that the existence of some conflict between Stefanowicz's story and that of the eyewitnesses in the hallway does not undermine the existence of probable cause.

Our conclusion is necessarily specific to the circumstances presented in this case. Were the events in the hallway the only basis for the assault charges against Dempsey, the evidence reflecting that Stefanowicz was the aggressor during that portion of the incident might have been material to a probable cause determination. But in light of the undisputed fact that the two were alone in Dempsey's room for some period of time; the lack of any evidence contradicting Stefanowicz's explanation of the events that occurred in the room, aside from Dempsey's explanation, i.e., that their playful wrestling "started to get more intense and Stefanowicz punched him in the groin," J.A. 268; and the existence of evidence corroborating her version of events in substantial part, no reasonable jury could conclude there was

44

not a "fair probability" that a crime occurred, notwithstanding the conflicting evidence as to Dempsey's intent and actions in the hallway.

## ii.    Time Alone

Dempsey also challenges the significance of the time he and Stefanowicz were alone together, asserting that the fact that he told BUPS that they were only alone in the room together for one minute materially undermines Stefanowicz's story about what happened during that time. In addition, he asks us to consider as part of our analysis Gregory Fast's September 12 statement, in which Fast indicated that he observed Stefanowicz and Dempsey during the time she said Dempsey was on top of her on the futon, while the two were alone, as part of our materiality analysis. As we explained in Part III.B.1, *supra*, however, that statement was received after both instances in which the affidavit of probable cause was sworn, and therefore we cannot consider it. We emphasize that in making the determination about the existence of probable cause, we examine only the information available to the officer at the time of the swearing of the affidavit of probable cause. After-acquired evidence, however significant for trial, does not inform an officer's knowledge or good faith as is relevant for our inquiry today.

As we have explained, we will consider not only Dempsey's statement, but, as the District Court did, all of the information on that topic received by the officers. As the reconstructed affidavit reflects, the officers had information indicating that the two were alone in the room together for somewhere between one minute and ten minutes. In addition, the officers knew that while the accused person had stated the two were only alone together for about one minute, a third-

45

party witness, Gregory Fast, had indicated in his September 5 statement that the time was around ten minutes. Furthermore, estimates of time may not always be particularly reliable. *See, e.g., Martin v. Ill. Cent. R.R. Co.*, 23 F.2d 324, 325 (5th Cir. 1928) ("Estimates of time and distance of bystanders witnessing an accident are notoriously inaccurate, and entitled to little weight at best."). In any event, it is not implausible that the events in the room that Stefanowicz described took place in the course of "about a minute." Viewing this evidence, along with all the other evidence of record, in the light most favorable to Dempsey, it is not material to the determination that there was a "fair probability" that a crime occurred.

## IV.    Conclusion

Because we conclude that no reasonable jury could find that the reconstructed affidavit lacked probable cause, we will affirm the order of the District Court.

46