PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-3393
_____

DAVID ANDREWS,
                    Appellant

v.

OFFICER ROBERT SCUILLI
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

(District Court Civil No. 2-13-cv-01657)
District Judge:  Honorable Cathy Bissoon

Argued October 25, 2016

BEFORE:  VANASKIE, KRAUSE,
and NYGAARD, *Circuit Judges*


(Filed: April 10, 2017)

Timothy P. O'Brien, Esq. [Argued]
1705 Allegheny Building
429 Forbes Building
Pittsburgh, PA 15219

    *Counsel for Appellant*


Carol A. VanderWoude, Esq. [Argued]
Marshall Dennehey Warner Coleman & Goggin
18th Floor, Suite 2300
2000 Market Street
Philadelphia, PA 19103

    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge.*

## I.

David Andrews was found not guilty of the crimes for which he was charged. He brought suit against Officer Robert Sciulli for false arrest and malicious prosecution.[1] On

---

[1] We note that Officer Sciulli's name is spelled "Scuilli" in various places throughout the record, in our Court's caption, and in that of the District Court. Nonetheless, it is apparent

appeal he contends that the District Court erred by granting summary judgment, on the basis of qualified immunity, in favor of Sciulli. We agree. We will reverse the District Court's judgment and remand the cause for trial.

## II.

On November 25, 2012 in Stowe Township, Pa, Brooke Wagner was walking on a sidewalk from a friend's house to her home. She was fifteen years old. A man in a car approached her and asked if she wanted a ride. She told him "no." He demanded that she get in the car. Wagner again refused and told him that she would report him to the police. He sped away. She used her mobile phone to call her mother, who told her to go home. The mother then called the police.

Both Officer Sciulli and Officer Antonio Reymundo Ruiz of the Stowe Township Police Department arrived at Wagner's home within minutes of the mother's report. Upon questioning by Ruiz, Wagner described the vehicle as a red, four-door sedan. She said that the car had a Pennsylvania license plate bearing the letters ACG. She described the driver as a white male with dark hair, around 35 years old. Ruiz gave this information to Sciulli, who then went to the location of the incident. Sciulli prepared an Incident Investigation Report that same day, recording the details Wagner had provided.

from his police reports that the correct spelling of Appellee's name is "Sciulli," Appx 130, 145, and we will use that spelling in our opinion.

The next day, the mother was driving Wagner home from a grocery store when Wagner saw a red car. She told her mother that it was the car that had stopped next to her the day before. She noted that the license number was JDG4817. They followed the car until it stopped in a parking lot. Her mother drove into the lot and parked. Wagner observed the driver get out and walk into a building. She believed he was the man that tried to lure her into the car on the day before.

Wagner's mother then drove her directly to the police station. They met with Sciulli and Officer Gruber.[2] Wagner reported what she observed: the red car, the full license number, and the driver. She also stated her conclusion that this was the car and man she encountered the previous day. The officers checked the license number, JDG4817, in the JNET database and identified the car as belonging to David Andrews. They obtained Andrews' license photo and created a photo array with images of Andrews and seven other men.[3] Sciulli presented the lineup to Wagner and instructed her to circle the picture of anyone she recognized. Wagner circled the image of Andrews.

After Wagner and her mother left the station, Sciulli went to the parking lot they said was the location of Andrews'

---

[2] The record does not provide Officer Gruber's full name.

[3] There is a discrepancy on whether Gruber, or both Gruber and Sciulli prepared the photo lineup. We do not regard this as material to the matter, and merely note the dispute.

4

car and he looked at the vehicle.[4]  Andrews' automobile was not a four-door sedan, but a red, three-door coupe.[5]

Sciulli drafted an affidavit of probable cause to arrest Andrews.  The affidavit, dated November 28, 2012, stated:

> Officers were notified on 11/25/12 at approximately 1112 hours, of a possible child luring

---

[4] We discuss the sequence of Sciulli's observation of the car and his writing the probable cause affidavit in greater detail later in the opinion.  *See infra* pp 11-13.

[5] The District Court refers to Andrews' car as a "three-door hatchback."  *Andrews v. Sciulli*, No. CIV.A. 13-1357, 2015 WL 5732101, at *4 (W.D. Pa. Sept. 30, 2015).  However, the record shows that Andrews' car was a 2001 Saturn SC. Appx. 240.  Andrews described this car as a coupe style (as opposed to a sedan) with one door on the passenger side.  On, the driver's side, there is a full door and a small rear-hinged door.  The small door aided access to the backseat.  There is no mention of a hatchback door or lid in the rear of the car anywhere in the record.  Sciulli did not raise this detail at the District Court and admitted in deposition that he knew the car was not a four-door sedan, as Wagner described.  Therefore, the District Court's seeming error in characterizing the car as a "hatchback" is of no real consequence.  Nonetheless, we will refer to Andrews' car as a "three-door coupe" to distinguish it from the "four-door sedan" that Wagner described.

incident. I, officer Sciulli, and officer Ruiz were dispatched to 1309 Island Avenue to meet the victim. At this time, officers spoke with the victim. The female juvenile's information was obtained and is on record and said juvenile and parent will be present at all court hearings.

The victim (female juvenile age 15) stated that while walking home from a friend's house, a red vehicle pulled up next to her while walking on the sidewalk and asked her (juvenile age 15) if she wanted a ride. The victim stated "NO". The defendant then said "COME ON, JUST GET IN". The victim then said "NO, I'M FINE. Now I am going to report you". The victim then stated that the vehicle sped away.

The victim then described this male as a middle aged white male with dark hair with streaks of gray. Victim described the vehicle as a red 4 door sedan.

On 11/26/12, the victim spotted this same vehicle described above, driving on Island Avenue,

while riding with her mother. She identified the plate as JDG4817, PA tag. They followed the vehicle to Axion, and victim again positively identified the male driver as the suspect she encountered the previous day.

The victim and her mother came to the station to give officers this information. Officers ran the PA plate, JDG4817, and found it to be registered to David Gene Andrews, out of Beaver Falls, PA. Based on this information, officers created a line up using similar identifiers as Andrews.

The victim was shown a line up, created by myself and officer Gruber, generated by descriptors through J-NET[sic]. The victim was asked to look at the pictures and to see if there was anyone of the pictures that she recognized as the driver of the car. She was advised that he might or might not be in the pictures. The victim looked at the pictures and almost immediately picked out the picture of defendant. The defendant was identified through JNET Pa. drivers [sic] license as

7

> David Gene Andrews, DOB
> [REDACTED].
>
> Your affiant respectfully requests
> that a warrant be issued for David
> Gene Andrews based on the facts
> enumerated above.

Appx. 245.[6]

The magisterial district judge reviewed the affidavit and issued the arrest warrant on November 28, 2012. That same day, police arrested Andrews and charged him with luring a child into a motor vehicle, stalking, corruption of a minor, and harassment. In a bench trial, he was acquitted of all charges in June 2013. Andrews filed this lawsuit on November 20, 2013. The District Court granted Sciulli's motion for summary judgment on September 30, 2015. This appeal followed.

## III.

### A.

---

[6] The affidavit refers to "Axion." This location is referenced as "Axiom" in other places in the record. *See e.g.* Appx. 150. The record does not ground a conclusion on the correct spelling, so we merely note the difference and leave the affidavit as is.

We review de novo the District Court's grant of summary judgment. *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003).[7] Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). When we review the District Court's grant of summary judgment, we will reverse only in those instances when we conclude that material facts are in dispute, or when we determine that the undisputed facts—viewed in a light most favorable to the non-moving party—could objectively support a jury's verdict in favor of the non-moving party. *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995).

Andrews raises claims of false arrest and malicious prosecution against Sciulli. To assess claims of false arrest, the court must determine whether "the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). Malicious prosecution requires evidence that:

> (1) the defendant[] initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant[] acted maliciously or for a purpose other than bringing

---

[7] We have jurisdiction pursuant to 28 U.S.C. §1291.

9

the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood,* 407 F.3d 599, 601 (3d Cir.2005).

However, Sciulli contended at summary judgment that he has qualified immunity from this lawsuit because probable cause grounded the arrest and prosecution. "'[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Orsatti*, 71 F.3d at 483 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). [8] Since the District

---

[8] "'A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.'" *Wright v. City of Philadelphia*, 409 F.3d 595, 600 (3d Cir. 2005) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).).

10

Court decided that no constitutional violation occurred, we examine this first.

### B.

The District Court correctly ascertained that, since false arrest and malicious prosecution hinge on probable cause, the constitutional violation question in this case turns on whether "'a reasonable officer could have believed that probable cause existed' to arrest" the plaintiff at that time. *Blaylock v. City of Philadelphia*, 504 F.3d 405, 411 (3d Cir. 2007) (quoting *Hunter v. Bryant,* 502 U.S. 224, 228-29 (1991)). Moreover, because Sciulli arrested Andrews on a valid warrant, the District Court properly focused its probable cause analysis on whether Sciulli "'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant.'" *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). Therefore, we must concentrate on two elements: first, whether "the officer, with at least a reckless disregard for the truth, 'made false statements or omissions that create[d] a falsehood in applying for a warrant,' and second, whether those assertions or omissions were 'material, or necessary, to the finding of probable cause. [*Wilson v. Russo*, 212 F.3d 780, 786-87 (3d Cir. 2000)] (quoting *Sherwood*, 113 F.3d at 399).'" *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468–69 (3d Cir. 2016).

However, as we recently acknowledged, a certain tension exists when probable cause is at issue in a motion for summary judgment. *Dempsey,* 834 F.3d at 468. This is

11

particularly so for analyses that center upon misrepresentations and omissions in the affidavit of probable cause. Although a finding of probable cause generally can be based on an officer's credibility determinations and independent assessments of conflicting evidence, "it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party." *Dempsey,* 834 F.3d at 468. As a result:

> [We cannot] exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider. Instead, we view all such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred.

*Id.* For these reasons we rely on our general rule that an assertion "is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson*, 212 F.3d at 788 (quoting *United States v. Clapp,* 46 F.3d 795, 801 n. 6 (8th Cir. 1995)). Misleading assertions can relate to even "minor details," and do not need a separate determination of relevance. The focus in these instances is upon evidence demonstrating that the affiant willingly and "affirmatively distort[ed] the truth." *Id*. at 788. Omissions

are made with reckless disregard where "an officer withholds a fact in his ken that '[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know.'" *Id.* (quoting *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir.1993)).

## C.

The District Court found an omission in the affidavit Sciulli prepared. It concluded that Sciulli was aware that Wagner reported a partial license plate–ACG—on the day of the incident, but omitted it from his affidavit. It ruled that a reasonable person would know that a judge would want to see this in the probable cause affidavit.

The District Court was also convinced that Sciulli willfully made a number of false or misleading assertions. Specifically, Sciulli falsely represented Wagner's description of the perpetrator as a "middle aged white male with dark hair with streaks of gray." Appx. 245. The police incident report Sciulli prepared indicates she said that the man was "about 35 years old," with "dark hair." Appx. 130. The District Court noted that Sciulli's averments more closely aligned with Andrews' driver's license photo, and concluded from this that Sciulli's actions went beyond carelessness or simple negligence. These were affirmative assertions of misleading information.

Next, the District Court was convinced that, due to the license plate differences, Sciulli had an "obvious reason" to doubt that his assertion that Wagner spotted the "same vehicle" the day after the incident. *Andrews,* 2015 WL 5732101, at *6. Similarly, it concluded Sciulli's statement

13

that Wagner positively identified Andrews "again" was inaccurate because it overstated her confidence in the identification. None of these conclusions by the District Court are at issue in this appeal.[9]

We are convinced, however, that the District Court erred by failing to identify an additional omission. In spite of ruling that Sciulli's reference to the "same vehicle" was a misleading assertion, the District Court concluded that the record did not provide any evidence that the officer knew there were differences between Andrews' car and the perpetrator's car. This is error. [10] Sciulli affirmed that, after speaking with Wagner and her mother on November 26, 2012 about the location of Andrews' car, he went to look at the

---

[9] Andrews claims that the District Court erred by failing to rule on the impact of Sciulli's words to Wagner as he presented the photo array to her. However, Sciulli included what he said to Wagner in the affidavit. Appx. 245. Therefore, Sciulli neither omitted or misrepresented these words. Andrews also takes issue with certain remarks Sciulli made after Wagner selected his photo. But, the District Court properly ruled that this was irrelevant to Wagner's decision because it occurred after she selected a photograph.

[10] We presume that, if the District Court had reconstructed the affidavit, it would have corrected the affidavit by changing "this same vehicle" to "a vehicle." In light of this, to be consistent with the District Court's findings, we treat the details about Andrews' car separately as an omission from the affidavit, rather than a misrepresentation.

14

vehicle. He was aware, at that time, that the car was not a four-door sedan.

> Q. Did you make any effort to go to the Axiom parking lot to observe the vehicle that Ms. Wagner or [her mother] said was there when they observed it on November 26, 2012?
>
> A. Yes.
>
> Q. Okay, when did you go to that parking lot?
>
> A. I can't recall an exact time. It would have been after speaking with them.
>
> Q. When you saw that vehicle, you knew that it was not a four door, correct?
>
> A. Yes.

Appx. 151-52. Sciulli expressed uncertainty about the time, not the date, that he went to the parking lot. Moreover, he admitted knowing that Andrews' car was different from Wagner's description. This is clear evidence that, at some point on November 26, 2012, Sciulli knew that Andrews' car was different from the car Wagner described the previous

day.[11] Sciulli equivocates only on whether he had this knowledge before he wrote the affidavit. Appx. 152. But, there is no dispute that Sciulli signed and swore to the truthfulness of his affidavit on November 28, 2012. Appx. 245. This is significant.

When an officer submits a sworn affidavit of probable cause, he or she "is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Dempsey*, 834 F.3d at 469 (quoting *Wilson*, 212 F.3d at 790). Therefore, even if Sciulli drafted the affidavit on November 26, 2012, before going to the parking lot, he, at the very least, had good reason to doubt, on November 28, 2012, the truthfulness of his affidavit that falsely stated Andrews' car was the same red four-door sedan that Wagner described on the day of the incident. Consistent with the District Court's ruling on the license plate number, we are confident that this omission regarding the discrepancy in the number of doors on the cars is something that "any reasonable person would know that a judge would want to know." *Wilson*, 212 F.3d at 783.

D.

The District Court's analysis focused on the omitted license plate number and the overstatement of confidence attached to Wagner's positive identification of Andrews. But,

---

[11]Even if we were to read this portion of the record as ambiguous, Andrews is entitled to a favorable, reasonable inference at summary judgment that Sciulli possessed this knowledge on November 26, 2012.

16

it did not present a reconstructed affidavit that corrects misleading assertions and includes omitted evidence. The memorandum opinion was filed roughly eleven months before we clarified our requirement that courts "perform a word-by-word reconstruction of the affidavit" to ensure that all relevant evidence known to the police officer at the time is considered in the materiality analysis. *Dempsey*, 834 F.3d at 470. Therefore, particularly since we have concluded that there is an additional omission, we will—in the interest of judicial economy—reconstruct the affidavit, rather than require it to be done on remand. *Id.* at 475. It reads as follows:

> Officers were notified on 11/25/12 at approximately 1112 hours, of a possible child luring incident. I, officer Sciulli, and officer Ruiz were dispatched to 1309 Island Avenue to meet the victim. At this time, officers spoke with the victim. The female juvenile's information was obtained and is on record and said juvenile and parent will be present at all court hearings.
>
> The victim (female juvenile age 15) stated that while walking home from a friend's house, a red vehicle with four doors pulled up next to her while walking on the sidewalk and asked her (juvenile age 15) if she wanted a ride. The

17

victim stated "NO". The defendant then said "COME ON, JUST GET IN". The victim then said "NO, I'M FINE. Now I am going to report you." The victim then stated that the vehicle sped away.

The victim then described this male as a ~~middle aged~~ white male with dark hair ~~with streaks of gray~~ [about 35 years old]. Victim described the vehicle as a red 4 door sedan. **[She identified a partial license plate as ACG, PA tag.]**

On 11/26/12, the victim spotted **~~this same vehicle described above~~ [a vehicle, a red three-door coupe],** driving on Island Avenue, while riding with her mother. She identified the plate as JDG4817, PA tag. They followed the vehicle to Axion, and victim ~~again~~ positively identified the male driver as the suspect she encountered the previous day.

The victim and her mother came to the station to give officers this information. Officers ran the PA

18

plate, JDG4817, and found it to be registered to David Gene Andrews, out of Beaver Falls, PA. Based on this information, officers created a line up using similar identifiers as Andrews.

The victim was shown a line up, created by myself and officer Gruber, generated by descriptors through J-NET[sic]. The victim was asked to look at the pictures and to see if there was anyone of the pictures that she recognized as the driver of the car. She was advised that he might or might not be in the pictures. The victim looked at the pictures and almost immediately picked out the picture of defendant. The defendant was identified through JNET Pa. drivers [sic] license as David Gene Andrews, DOB [REDACTED].

Your affiant respectfully requests that a warrant be issued for David Gene Andrews based on the facts enumerated above.

E.

19

To affirm the District Court's grant of summary judgment, we must conclude that "no reasonable jury could find facts that would lead to the conclusion" that the reconstructed affidavit "lacked probable cause." *Wilson,* 212 F.3d at 792. When the District Court ruled that the omissions and misleading assertions it found were not material to probable cause, it did so convinced that there were no substantial distinctions between the facts in *Wilson* and in this case. Although we ultimately conclude that *Wilson* is distinguished, it does provide a useful point of reference in our analysis of this case.

In *Wilson*, a police officer (Darrin Russo) claimed that probable cause for a warrant existed because an eyewitness (the owner of a floral shop that was robbed) positively identified Franklin Wilson from a photo array. *Id.* at 785. Russo excluded some exculpatory evidence.[12] We decided

---

[12] (1) Russo did not inform the court that the shop owner (whose height was around 5´6″) estimated the robber's height on the day of the crime to be between 6´2″ and 6´4″; but, the man she identified three days later in a photo lineup, Wilson, was only 5´11″. *Id.* at 785. (2) Russo did not mention to the court that the floral shop employee looked at the same photo array and did not identify anyone. (The floral shop employee estimated that the robber was 6´5″tall.) *Id.* (3) Russo did not inform the court that a dental office employee, who linked the others' physical descriptions of the robber to Wilson, saw him at a time that contradicted the account given by the two in the floral shop. The dental office employee saw Wilson in the shopping center around 3:30 PM; but, the shop owner and

that the exculpatory evidence Russo left out did not fatally undermine the eyewitness' positive identification and concluded that "[w]hen a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause." *Id.* at 791 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 818-19 (3d Cir. 1997)).[13] Nonetheless, stressing that probable cause requires an individualized analysis, we also said that "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist." *Id.* at 790. Therefore, since the District Court's probable cause ruling in this case rests squarely on Wagner's positive identification of Andrews, our materiality review centers on whether any of the misleading assertions and omitted facts that we corrected in our reconstructed affidavit could outweigh this identification, or undermine reliance on it.

F.

---

shop employee said the robber was in their store from 3:00 PM to 3:50 PM. *Wilson,* 212 F.3d at 784-85.

[13] Probable cause to arrest "exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers,* 308 F.3d 251, 255 (3d Cir.2002).

The first changes to the affidavit concern Wagner's physical description of the perpetrator from the day of the incident. Sciulli misrepresented the description by, as the District Court noted, making it hue closer to the image of Andrews' driver's license photo. The reconstructed affidavit reads as follows:

> The victim then described this male as a ~~middle aged~~ white male with dark hair ~~with streaks of gray~~ **[about 35 years old]**.

We agree with the District Court's application of *Wilson* to these misleading assertions; standing alone, they would not be material to probable cause.

In *Wilson*, the police officer did not inform the court that the shop owner estimated the robber's height on the day of the crime to be between 6′2″ and 6′4″; but, the man she identified three days later in a photo lineup (Wilson), was only 5′11″. *Id.* at 785. We ruled that "this indication of unreliability does not, from the vantage point of the arresting officer, fatally undermine the forceful positive identification." *Id.* at 791.

We elaborated, however, that different facts could produce different results. We posed the example of an officer who is aware that a witness described the robber as 7′ tall, but selected a person in a photo lineup who is actually 5′ tall. This "substantial evidence of the witness's own unreliability" could change the probable cause analysis. *Id.* at 790. We also gave a scenario in which an officer knows about reliable, independent, exculpatory DNA evidence that contradicts a

22

positive identification.  In such a case "the positive identification would not be enough" to outweigh such evidence.  *Id*.  These examples were, of course, illustrative of a common sense approach to the materiality analysis; they are not bright-line rules.  *See Illinois v. Gates,* 462 U.S. 213, 232 (1983) ("[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usually, reduced to a neat set of legal rules."); *see also Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016) (Probable cause analysis uses a "common sense approach" to issues grounded in a totality of the circumstances.).  Nonetheless, we can safely extract from them a general principle that glaring discrepancies in a witness' testimony can undermine the reliability of an eyewitness who provides a positive identification.[14]  The

---

[14]We regard "glaring differences" as those that would be , by the lights of any reasonable person in the same circumstances, significant because they fall well outside common-sense margins of error that typically apply to witness' subjective observations involving estimation and approximation.  These types of discrepancies are not easily or reasonably reconciled. *Compare Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (Probable cause analysis "does not require the *fine* resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands."(emphasis added)); *and, Dempsey*, 834 F.3d at 481 (Witness estimates of time are notoriously unreliable.); *and, Peet v. City of Detroit,* 502 F.3d 557, 564 (6th Cir. 2007) (The "differences are minor and are of the sort to be expected when different eye witnesses recollect the same event."); *with*, *Robinson v. Winslow Twp*., 973 F. Supp. 461, 471 (D.N.J. 1997) ("A reasonable jury

same is true when our review uncovers highly reliable, independent, exculpatory evidence known by the officer.

Applying this understanding to the facts in question here, Sciulli's misrepresentation of Wagner's description of the perpetrator's age and hair, on its own, does not outweigh or undermine her positive identification. Although Sciulli's misrepresentations did make Wagner's description of the perpetrator seem more like Andrews, correcting "middle aged" to read "about 35," and deleting a reference to a "streaks of gray" in the perpetrator's hair are, by our lights, trivial differences that would not impact a reasonable jury's conclusions about probable cause. Sciulli's misrepresentation made his description of the perpetrator's age inaccurate and more vague. But, as with the height difference in *Wilson,* an estimate of age is inherently grounded in a subjective approximation that allows for reasonable margins of error. Here, even after making appropriate corrections, we regard the difference between "about 35" and Andrews' actual age at

---

could conclude that although eyewitness descriptions are not always accurate, the police should have known that the eyewitnesses simply could not have described a 5′4″ man as being six foot tall."); *and*, *Mendez v. Artuz,* 303 F.3d 411, 415 (2d Cir. 2002) (In the context of a habeas corpus case, where testimony described the shooter as between 5′4″ and 5′8″ and 130 pounds and the height and weight of the suspect was 6′2″and 190 pounds, the court said: "[t]he contradictory eyewitness testimony about the shooter's height and weight . . . gives us pause. . . .These discrepancies are significant and troubling.").

that time (51) as difficult to visualize or estimate in any precise way, falling within a margin of error that is expected with approximations of this type. Therefore, this misleading assertion did not obscure a discrepancy that is meaningful enough, by itself, to create doubt about the credibility of the witness.[15] For these reasons, we conclude that Sciulli's misrepresentation, standing alone, would not be material to the determination of probable cause here. Similarly, Sciulli's misrepresentation of Wagner's description of the perpetrator's hair (adding the detail of "streaks of gray") was also undeniably inaccurate, and made the description sound closer to Andrews' hair color. Nonetheless, Wagner's more general reference to "dark hair" is still inculpatory (albeit less strong), given that Andrews had black hair, and would not, by itself, be material to probable cause.

In summary, we conclude that this collection of misrepresentations in Sciulli's affidavit concerning the physical description of Andrews, standing alone, would not be sufficient to prevent a fact-finder from concluding that the reconstructed affidavit still established probable cause.[16]

---

[15] Like *Wilson*, our assessment of the materiality of the age discrepancy might be different if Andrews was 80 (or perhaps 16) years old: situations in which a mere error of approximation would not reasonably explain the gap.

[16] Of course, we must consider whether misrepresentations and reckless omissions, "considered in the context of the affidavit as a whole were . . . material, or necessary, to the finding of probable cause." *Dempsey*, 834 F.3d at 477. Thus, there may be instances when no single omission or

G.

We turn, next, to the portion of the reconstructed affidavit dealing with cars that Wagner linked to the crime. We made the following corrections.

> Victim described the vehicle as a red 4 door sedan. **[She identified a partial license plate as ACG, PA tag.]**
>
> On 11/26/12, the victim spotted ~~this same vehicle described above~~ **[a vehicle, a red three-**

---

misrepresentation is sufficient to defeat a finding of probable cause, but the combined effect of the omissions and misrepresentations suffices to call into question the reliability of the affiant and the affiant's witnesses such that the question of probable cause cannot be resolved on a summary judgment motion. We analyze here the misrepresentations in Sciulli's affidavit concerning Wagner's identification of Andrews to make clear that the discrepancies concerning Andrews' physical characteristics would not, standing alone, preclude a finding of probable cause. Of course, these are not the only misrepresentations that we have found. At a trial, the jury will be able to consider the reconstructed affidavit as a whole to make the ultimate determination as to whether a neutral magistrate, weighing both the inculpatory and exculpatory information in the reconstructed affidavit, would have found probable cause when presented with a properly drawn affidavit.

**door coupe],** driving on Island Avenue, while riding with her mother.

We agree with the District Court that Sciulli's assertion that Andrews' car was the "same vehicle" conveyed a higher degree of confidence in Wagner's positive identification than was due. Its materiality to probable cause, however, is best understood in the context of the omissions that accompany it. Therefore, we now turn to those.

Sciulli's affidavit hid from the magisterial district judge the partial license plate number on the car Wagner described immediately after the crime. It also did not disclose that Andrews' car was a three-door coupe. These details plainly distinguish Andrews' car from Wagner's initial description. Unlike Wagner's age estimate, these are irreconcilable differences that are not easily or reasonably explained. Importantly, Sciulli does not dispute this. He argues only that he did not have timely knowledge of the differences. All of this gives weight to the conclusion that these discrepancies are "substantial evidence of the witness's own unreliability" sufficient to outweigh her positive identification of Andrews. *Id.* at 791. However, there is one additional aspect of this case that is decisive on this issue for us. We can explain it most easily by focusing on a portion of our decision in *Wilson* that, thus far, has not been discussed.

In *Wilson*, three witnesses contributed information that led to the decision by police to put Wilson's image in a photo array. A floral shop owner and employee (eyewitnesses to the crime) gave physical descriptions of the robber, but neither of them knew anything about the robber's identity.

27

The third witness—a woman who worked nearby in a dental office—was not an eyewitness to the crime. But, upon hearing the descriptions from the floral shop owner and employee, she aided police by linking these to Wilson (who was a dental patient), giving police his name, and indicating that he was in the area around the time of the robbery. Police were then able to obtain Wilson's picture, put it in a photo array, and ask the floral shop owner and the floral shop employee to look at it. *Wilson*, 212 F.3d at 784-85.

In light of all of this, we ruled that the positive identification was reliable evidence of probable cause, in part, because: "[a]dded to this identification is the fact that [another witness] testified that she saw Wilson in the vicinity near the time of the theft." *Wilson*, 212 F.3d at 791. It mattered that the floral shop owner's positive identification lined up with the judgment of an unrelated witness that Wilson was the robber. *Wilson*, 212 F.3d at 791; *see also Dempsey*, 834 F.3d at 479 (corroborating testimony factored into our conclusion that the corrected affidavit showed probable cause).

Here, unlike *Wilson*, all evidentiary roads lead back to one person. Wagner was the only one who gave a description of the perpetrator and car to police on the day of the crime. She also was the only one who implicated Andrews by giving police his license number after seeing his car the next day. This license number was the sole impetus for police to compile a photo array using the image of Andrews from which the positive identification was made. There are no other points of reference for Wagner's positive identification.

28

A lack of independent corroboration, alone, is not necessarily fatal to the reliability of a positive identification grounding probable cause in any given case. However, having only one witness as the source of information about a crime and perpetrator does, logically, cast a brighter light on the body of evidence she or he provides. In such cases, the significance of any consistency or discrepancy in the witness' evidence is enhanced because these are the only indicia of the witness' reliability that are available. *See United States v. Singleton*, 702 F.2d 1159, 1179 (D.C. Cir. 1983) ("[I]f we are to rely upon the certainty of the witnesses, it is crucial to keep in mind that the witnesses were also positive about a number of aspects of their testimony that directly conflict with their identifications.").

The discrepancy here does not focus on a physical characteristic of the alleged perpetrator, but rather on the car that he drove. Yet, details about the car are central to Wagner's account of the crime. As we already noted, the analysis of probable cause is driven by common sense, requiring that we review the totality of the circumstances. *Goodwin*, 836 F.3d at 327. From this perspective, the differences between the vehicle Wagner described on the day of the crime and Andrews' car cannot be easily or reasonably explained or reconciled by the facts in the reconstructed affidavit.

All of this, inexorably, leads to the conclusion that Wagner must have been, either, mistaken about her observation of the car on the day of the crime; or, mistaken one day later, when she identified Andrews' car. This substantial contradiction—combined with the lack of independent corroboration of any aspect of the crime—

convinces us that Sciulli's omissions and misleading assertion are material to probable cause because they hid from the magisterial district judge a discrepancy that potentially undermines the sole witness' reliability. Accordingly, we do conclude that the reconstructed affidavit shows substantial evidence of the witness' own unreliability that could outweigh Wagner's positive identification. This question must be resolved by the fact finder. *See Lupyan v. Corinthian Colleges Inc.,* 761 F.3d 314, 322 (3d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). Therefore, it was error for the District Court to rule that "no reasonable jury could find facts that would lead to the conclusion that . . . [the reconstructed affidavit] lacked probable cause." *Wilson,* 212 F.3d at 792.[17]

---

[17] The reconstructed affidavit also states the following.

> They followed the vehicle to Axion, and victim ~~again~~ positively identified the male driver as the suspect she encountered the previous day.

This is unquestionably misleading. Wagner gave police only a description of the physical characteristics of the perpetrator on the day of the incident. Therefore, when she watched Andrews get out of his car in the parking the next day, she was not positively identifying him "again." As the District Court ruled, the assertion overstates the confidence of Wagner's observations. Nonetheless, we conclude that, by itself, this misleading assertion would not materially impact a fact-finder's analysis of probable cause.

## H.

This leaves us with the question of whether the rights at issue were clearly established at the time.[18] We need not dwell on this. "[T]here is no question that . . . the right to be free from arrest except on probable cause, was clearly established" at the time of Andrews' arrest. *Orsatti*, 71 F.3d at 483. Similarly, the right to be free from prosecutions on criminal charges that lack probable cause was also known and clearly established at the time that Sciulli prepared his affidavit. *See Donahue v. Gavin*, 280 F.3d 371, 380 (3d Cir. 2002). Both rights were grounded in well-settled law and thus, on the record of this case, "it would be clear to a reasonable officer that [Sciulli's] conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## IV.

---

[18] The District Court determined in the first stage of the analysis that there was no constitutional violation, and did not go any further. Because we reach a different conclusion about constitutional violations, we will also rule on the purely legal question of whether the law was clearly established, rather than instruct the District Court to address it on remand.

For all of these reasons, we will hold that the District Court erred by granting summary judgment to Sciulli on the basis of qualified immunity. Accordingly, we will reverse the order of the District Court and remand the cause for trial.[19]

---

[19] Sciulli also argues that Andrews waived any Fourteenth Amendment due process claim. But since Andrews states that he is not pursuing a Fourteenth Amendment claim, this argument is irrelevant.