NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2281
_____

GARRETT COLLICK; NOAH WILLIAMS; NANCY WILLIAMS

v.

WILLIAM PATERSON UNIVERSITY; KATHLEEN M. WALDRON;
ROBERT FULLEMAN; ELLEN DESIMONE;
WILLIAM PATERSON UNIVERSITY POLICE DEPARTMENT;
JOHN DOES 1–20 (names fictitious as presently unknown),
employees, representatives, and/or agents of defendant
WILLIAM PATERSON UNIVERSITY POLICE DEPARTMENT;
JANE DOES 1–20 (names fictitious as presently unknown),
employees, representatives, and/or agents of defendant
WILLIAM PATERSON UNIVERSITY POLICE DEPARTMENT;
JOHN SMITH 1–5 (names fictitious as presently unknown),
employees, representatives, agents, and/or spokespersons
of defendant WILLIAM PATERSON UNIVERSITY;
JANE SMITH 1–5 (names fictitious as presently unknown),
employees, representatives, agents, and/or spokespersons of
defendant WILLIAM PATERSON UNIVERSITY


Garrett Collick; Noah Williams,
                                            Appellants

_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:16-cv-00471)
District Judge: Hon. Kevin McNulty

_____


Submitted Under Third Circuit L.A.R. 34.1(a)
on March 31, 2022

Before: RESTREPO, ROTH, and FUENTES, *Circuit Judges*

(Opinion filed: October 24, 2022)

_____

OPINION[*]

_____

FUENTES, *Circuit Judge*.

Garrett Collick and Noah Williams ("Plaintiffs-Appellants"), two students at William Paterson University ("the University"), were arrested by the William Paterson University Police ("University Police") in November 2014 for the aggravated sexual assault of M.M., a fellow student at the University. After a grand jury declined to indict them, Plaintiffs-Appellants filed a lawsuit against the University; the University Police; Robert Fulleman, the University Police Director of Public Safety; and University Police Detective Sergeant Ellen DeSimone (together, "Defendants-Appellees"), asserting both tort and constitutional claims. Defendants-Appellees filed a motion to dismiss Plaintiffs-Appellants' claims, which the District Court granted in part and denied in part. Defendants-Appellees appealed, and we affirmed in part and reversed and vacated in part. At the conclusion of discovery, Defendants-Appellees filed a motion for summary judgment on the remaining claims, which the District Court granted. Plaintiffs-Appellants timely appealed. Because we conclude that Sergeant DeSimone had probable cause to arrest Plaintiffs-Appellants, we will affirm.

_____

[*] This disposition is not an opinion of the full Court and under I.O.P. 5.7 does not constitute binding precedent.

We assume the parties' familiarity with the facts and describe only those necessary to explain our decision. On November 25, 2014, the University Police responded to a call from the University health center about a female student, M.M., who claimed that she had been the victim of a sexual assault. The responding officer was Sergeant DeSimone. M.M. told Sergeant DeSimone that she had been sexually assaulted by five individuals after midnight earlier that day. She specifically named Plaintiffs-Appellants as two of the individuals. Sergeant DeSimone then took M.M. to the hospital for a sexual assault forensic examination.

At the hospital, M.M. told the nurse conducting her forensic interview,[1] Joanne Hatt, about what happened earlier that day. M.M. reported the following facts: She and Collick had plans to see each other the previous day, November 24, 2014, but Collick did not show up.[2] M.M. went to look for him and eventually found him in Termaine Scott's dorm room with four other individuals: Scott, Williams, Darius Singleton, and Williams's cousin (identified as "Walt"). M.M. tried to convince Collick to go to her room, but he refused and told her that "if she wanted to have sex with him[,] she would have to have sex with all of them."[3] M.M. then tried to leave but was prevented from doing so by someone standing at the door. M.M. told Sergeant DeSimone and Nurse Hatt that the men in the room began taunting her for sex. Collick then forced M.M. to perform oral

---

[1] Sergeant DeSimone was present for the forensic interview.
[2] Earlier, M.M. had disclosed to Sergeant DeSimone that she previously had "consensual sexual activity" with Collick.
[3] Joint Appendix ("JA") 214.

sex on him. Shortly thereafter, an unknown individual (later identified as Jahmel Latimer) entered the room and forced M.M. to perform oral sex on him while Collick groped her. When M.M. tried to get up, Collick again forced his penis in M.M.'s mouth. Latimer then pulled down M.M.'s pants and began having vaginal sex with her, but pulled out when M.M. told him the condom had broken inside of her. After, M.M. was forced to perform oral sex on Singleton, who also digitally penetrated M.M. and commented that "she is so dry."[4] Williams then attempted to force his penis into M.M.'s mouth, while Collick attempted to have vaginal sex with her. However, Collick could not maintain an erection, and M.M. remarked, "Oh, I see you have stage fright."[5]

M.M. eventually left Scott's room and was walked back to her dorm room by Williams, Scott, and Walt. Once there, they demanded that Williams be allowed to "finish" and that Walt "do something."[6] They refused to leave, so M.M. "gave up and just laid there" while Williams and Walt vaginally penetrated her.[7] Williams and Walt left M.M.'s room after they each had vaginal sex with her. Scott asked if he would get a turn, to which she responded that she had been "forced to do something [she] didn't want to do" and asked him to leave "because [she was] about to cry."[8]

While Nurse Hatt conducted her physical examination of M.M., Sergeant DeSimone showed M.M. photographs of Collick, Williams, Scott, and Singleton. M.M.

---

[4] *Id.* at 216.
[5] *Id.* at 722.
[6] *Id.* at 216.
[7] *Id.*
[8] *Id.* at 217.

positively identified the men in the photographs, including Plaintiffs-Appellants. After conducting the physical examination, Nurse Hatt told Sergeant DeSimone that M.M.'s "throat was red and it appeared to have abnormalities" and that M.M. complained of pain while swallowing.[9] In her report, Nurse Hatt identified a "redden[ed] area and several small pinpoint red area [sic]" on a diagram representing M.M.'s mouth.[10]

The following day, November 26, 2014, Sergeant DeSimone reviewed video surveillance and identification card access data for the dormitories where the alleged sexual assaults took place. These confirmed that Collick, Williams, Scott, Singleton, and Walt were in Scott's dormitory at the time of the alleged sexual assault, and that Williams, Scott, and Walt went to M.M.'s dormitory later that night. That day, Sergeant DeSimone also spoke with the University Police Director for Public Safety, Robert Fulleman, about seeking arrest warrants. A couple of days later, on November 28, 2014, Sergeant DeSimone conferred with the Senior Assistant Prosecutor for Passaic County in charge of the Domestic Violence Unit, Gina Pfund, about potential charges. After consulting with Fulleman and Pfund, Sergeant DeSimone contacted the Wayne Municipal Court Clerk to request arrest warrants for Plaintiffs-Appellants, along with

_____

[9] *Id.*

[10] *Id.* at 730. At her deposition, Nurse Hatt referred to these findings as "petechiae inside of [M.M.'s] mouth." *Id.* at 749. She defined "petechiae" as "little blood vessels that rupture and cause red pinpoint marks" that can be caused by trauma such as strangulation. *Id.* at 749–50. She testified that when she made this observation, she believed the petechiae were an injury, and that "the oral sex as described by MM . . . could have caused it." *Id.* at 752. Although Nurse Hatt noted that she likely would not have reported this to Sergeant DeSimone, Sergeant DeSimone testified at her deposition that her understanding of M.M.'s throat having "abnormalities" was that "there was [sic] injuries to her throat." *Id.* at 497.

5

Latimer, Singleton, and Scott.  These warrants were approved.  Plaintiffs-Appellants were arrested on November 29, 2014, and charged with aggravated sexual assault in the first degree, among other charges.

On January 26, 2015, a Passaic grand jury declined to indict them.  The Passaic County Prosecutor's Office ("PCPO") subsequently issued a twelve-point memorandum that criticized the University Police's investigation, instituted a policy that the University Police notify and consult the PCPO regarding all sexual assault investigations, and prohibited the University Police from making charging decisions in sexual assault cases.

In December 2015, Plaintiffs-Appellants sued Defendants-Appellees in the Superior Court of New Jersey asserting both tort and constitutional claims.  Defendants-Appellees subsequently removed the case to the United States District Court for the District of New Jersey and filed a motion to dismiss.  The District Court granted the motion as to certain claims but declined to dismiss Plaintiffs-Appellants' Fourth Amendment-based § 1983 claims on qualified immunity grounds.[11]  Defendants appealed, and we affirmed.[12]  After discovery concluded, Defendants-Appellees moved

---

[11] In May 2019, certain claims were voluntarily dismissed.
[12] *Collick v. William Paterson Univ.*, 699 F. App'x 129 (3d Cir. 2017).

for summary judgment on the remaining claims.[13]  The District Court granted the motion and dismissed Plaintiffs-Appellants' remaining claims, concluding that probable cause to arrest defeated these claims.  This appeal followed.

## II.

The District Court had jurisdiction over Plaintiffs-Appellants' claims under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291.  Our review of the District Court's grant of summary judgment is plenary.[14]  We will affirm the District Court only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15]  We must view facts in the light most favorable to the non-moving party.[16]  The non-moving party "is entitled to every reasonable

---

[13] The remaining claims included: (1) a § 1983 claim against Sergeant DeSimone and Director Fulleman for deprivations of Plaintiffs-Appellants' Fourth Amendment rights (Count 2); (2) a § 1983 claim against the University and University Police for governmental liability for violations of Plaintiffs-Appellants' Fourth Amendment rights (Count 5); (3) a claim under the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2, against Sergeant DeSimone and Director Fulleman for violations of Plaintiffs-Appellants' Fourth Amendment rights and corresponding rights under the New Jersey Constitution (Count 6); (4) an NJCRA claim against the University and University Police for governmental liability for violations of Plaintiffs-Appellants' Fourth Amendment rights and corresponding rights under the New Jersey Constitution (Count 7); (5) false arrest and imprisonment under New Jersey law against Sergeant DeSimone and Director Fulleman (Count 9); (6) malicious prosecution under New Jersey law against Defendants-Appellees (Count 10); (7) negligent training and supervision under New Jersey law against Director Fulleman, the University, and University Police (Count 15); (8) intentional infliction of emotional distress under New Jersey law against all defendants (Count 16); (9) negligence and gross negligence under New Jersey law against all defendants (Counts 18 & 19); and (10) respondeat superior liability under New Jersey law against the University and University Police for Sergeant DeSimone and Director Fulleman's torts (Count 20).
[14] *Reedy v. Evanson*, 615 F.3d 197, 210 (3d. Cir 2010).
[15] Fed. R. Civ. P. 56(a).
[16] *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016).

inference that can be drawn from the record."[17]  "We do not weigh the evidence; rather, we determine 'whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.'"[18]  Here, summary judgment is only appropriate if we determine that "a reasonable jury could not find a lack of probable cause."[19]

### III.

### A.

Because the claims at issue turn on whether there was probable cause to arrest Plaintiffs-Appellants for aggravated sexual assault in the first degree, we focus our analysis on a finding of probable cause.[20]  As the District Court recognized, the question

---

[17] *Id.* (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000)).

[18] *Id.* (quoting *Reedy*, 615 F.3d at 210).

[19] *Id.* (quoting *Montgomery v. DeSimone*, 159 F.3d 120, 124 (3d Cir. 1998)).

[20] Plaintiffs-Appellants do not discuss any specific claims in their briefs, instead focusing on the probable cause analysis which is dispositive of all claims dismissed by the District Court at summary judgment.  *See Dempsey*, 834 F.3d at 479 (affirming district court's grant of summary judgment dismissing § 1983 claims because "no reasonable jury could determine that the affidavit lacked probable cause"); *Herman v. City of Millville*, 66 F. App'x 363, 365 n.3, 368 (3d Cir. 2003) (non-precedential) (affirming district court's grant of summary judgment dismissing claims for negligence, negligent training/supervision, and intentional infliction of emotional distress under New Jersey law because there was probable cause to arrest); *Wildoner v. Borough of Ramsey*, 744 A.2d 1146, 1154 (N.J. 2000) ("[P]robable cause is an absolute defense to Plaintiff's false arrest, false imprisonment, and malicious prosecution claims."); *Cruz v. Camden Cnty. Police Dep't*, 245 A.3d 254, 261 (N.J. Super. Ct. App. Div. 2021) ("'[P]robable cause is an absolute defense' to NJCRA claims." (citation omitted)).  Because a finding of probable cause to arrest precludes Sergeant DeSimone and Director Fuller from being held liable for any of the tort claims asserted against them, the University and University Police cannot be held liable under a theory of respondeat superior.  *See Smith v. Spina*, 477 F.2d 1140, 1147 (3d Cir. 1973) (stating that under a respondeat superior theory, "liability of . . . servant was a necessary prerequisite to the liability of the master").  Similarly, Plaintiffs-Appellants' failure to show a constitutional violation by the police defeats the derivative claims brought in Counts 5, 7, and 15.  *See Vargas v. City of Philadelphia*, 783 F.3d 962, 974–75 (3d Cir. 2014) (§ 1983); *Szemple v. Corr. Med.*

8

is "whether, at the time, police had evidence amounting to probable cause," not "whether Collick and Williams were actually guilty of sexual assault, whether Sergeant DeSimone's investigation can be criticized, or whether all the evidence we now possess would have supported such charges."[21]  Probable cause "is not a high bar."[22]

A warrantless arrest is subject to a totality-of-the-circumstances analysis of probable cause.[23]  "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."[24]  In short, there must be "a 'fair probability' that the person committed the crime at issue."[25]  An officer must consider plainly exculpatory evidence when making a probable cause determination, "even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."[26]  However, "the probable cause inquiry . . . does not require that officers correctly resolve conflicting evidence," only that

---

*Servs., Inc.*, 493 F. App'x 238, 241 (3d Cir. 2012) (non-precedential) ("The NJCRA is interpreted as analogous to § 1983. . .  To sustain a § 1983 claim, or a NJCRA claim, a plaintiff must show that a defendant had in place a custom or policy which resulted in constitutional deprivation." (citations omitted)).

[21] JA 15 (citing, *inter alia*, *Dempsey,* 834 F.3d at 477).

[22] *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks and citation omitted).

[23] The District Court recognized that "[t]he probable cause analysis differs depending on whether the arrest occurred pursuant to a valid warrant" and ultimately "default[ed] to the [warrantless arrest] totality-of the-circumstances test for probable cause" because no "constitutionally adequate process for obtaining a warrant was followed."  JA 12. Plaintiffs-Appellants do not challenge the District Court's application of this test.

[24] *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citation omitted).

[25] *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (citation omitted).

[26] *Id.* at 790 (internal quotation marks and citation omitted).

9

"their belief was not unreasonable in light of the information the officer[] possessed at the time."[27]

"Whether any particular set of facts suggest[s] that arrest is justified by probable cause requires an examination of the elements of the crime at issue."[28] The crime at issue here is aggravated sexual assault in the first degree. A person is guilty of aggravated sexual assault in the first degree if he (1) "commits an act of sexual penetration with another person"; (2) "is aided or abetted by one or more other persons"; and (3) "commits the act using coercion or without the victim's affirmative and freely-given permission."[29] Where "the State does not allege violence or force extrinsic to the act of penetration," the key question is "whether the defendant's act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration."[30] "Such permission can be indicated either through words or through actions that, when viewed in the light of all the surrounding circumstances, would demonstrate to a reasonable person affirmative and freely given authorization for the specific act of sexual penetration."[31]

With those standards in mind, we now turn to the evidence available to Sergeant DeSimone at the time of Plaintiffs-Appellants' arrests to determine whether a reasonable

---

[27] *Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005) (citation omitted).
[28] *Id.*at 601 (citations omitted).
[29] N.J. Stat. Ann. § 2C:14-2. Plaintiffs-Appellants do not dispute that a sexual act occurred or that multiple parties were involved. Rather, they contend that M.M. "consented to and was a willing and active participant" in the sexual acts that occurred that night. Appellants' Opening Br. at 16.
[30] *State ex rel. M.T.S.*, 609 A.2d 1266, 1278 (N.J. 1992).
[31] *Id.*

officer would have concluded that there was a fair probability that Plaintiffs-Appellants

had committed aggravated sexual assault in the first degree. First, M.M. told Sergeant

DeSimone, both at the University health center and later at the hospital, that she had been

sexually assaulted by five individuals. Specifically, M.M. told Sergeant DeSimone that

both Plaintiffs-Appellants tried to force their penis into her mouth, and that when she

returned to her dorm room with Williams, Scott, and Walt, they refused to leave, so she

"gave up and just laid there" while Williams and Walt vaginally penetrated her.[32]

Second, M.M. positively identified Plaintiffs-Appellants when Sergeant DeSimone

showed her their photographs. Third, Nurse Hatt told Sergeant DeSimone that M.M.'s

"throat was red and it appeared to have abnormalities," and that M.M. complained of pain

while swallowing.[33] Fourth, Sergeant DeSimone reviewed video surveillance and

identification card access data that placed Plaintiffs-Appellants in Scott's and M.M.'s

dormitories at the time of the sexual assaults.[34]

---

[32] JA 216.

[33] *Id.* at 217.

[34] Plaintiffs-Appellants argue that the District Court's holding that "'the security information's corroborative effect generally bolstered M.M.'s credibility and placed Collick and Williams at the scene[]' . . . ignores the undisputed fact that subject evidence did not []and does not place plaintiffs and other accused individuals 'at the scene' because they all lived in the subject dormitory building that housed other students." Appellants' Opening Br. at 18 (emphasis omitted) (quoting JA 21). They assert that DeSimone admitted that there was "(a) no video footage of the alleged assault; (b) no video footage from the dorm building's hallway; and (c) there was nothing unusual with plaintiffs and the other accused men walking in and out of the dorm building where they all lived." *Id.* (citations omitted). Plaintiffs-Appellants' argument ignores the undisputed fact that Plaintiffs-Appellants were in the subject dormitories at the time of the alleged assaults (as opposed to elsewhere). Additionally, as the District Court noted, "probable cause does not require officers to rule out [an] innocent explanation for suspicious facts . . . . [T]he relevant inquiry is not whether the particular conduct is innocent or guilty, but

11

This is sufficient to support a finding of probable cause. Sergeant DeSimone reasonably believed that M.M. was a reliable witness given her consistent recounting of the assault[35] and the generally corroborative evidence in both M.M.'s physical exam and the dormitory video surveillance and identification card access data that Sergeant DeSimone reviewed.[36] M.M. also correctly identified Plaintiffs-Appellants from an array of photographs.[37] Based on these facts, we find that Sergeant DeSimone had probable cause to arrest Plaintiffs-Appellants.

B.

In determining whether there was probable cause to arrest Plaintiffs-Appellants for aggravated sexual assault in the first degree, we must also consider whether there is "[i]ndependent exculpatory evidence or substantial evidence of [M.M.'s] own

---

the degree of suspicion that attaches to particular types of noncriminal acts." JA 20 (quoting *Wesby*, 138 S. Ct. at 588). Thus, viewed in light of the totality of the circumstances, the fact that Plaintiffs-Appellants were in the subject dormitories at the time of the alleged assaults corroborates M.M.'s version of events and supports our finding of probable cause.

[35] *Wilson*, 212 F.3d at 790 ("[N]on-trivial discrepancies, or external evidence powerfully undermining the reliability of the witness's identification, might translate into a finding that there was no probable cause." (citing *Lallemand v. Univ. of R.I.*, 9 F.3d 214, 217 (1st Cir. 1993))); *cf. Andrews v. Sciulli*, 853 F.3d 690, 695 (3d Cir. 2017) (finding a lack of probable cause where victim-witness's later identification of the accused's car contradicted her original report).

[36] *See Dempsey*, 834 F.3d at 438–39 (holding that statements of victim-witness and corroborative physical evidence support a finding of probable cause).

[37] *See Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest." (citing *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991)), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007).

unreliability that outweighs the probable cause otherwise established."[38] Plaintiffs-Appellants contend that the District Court improperly disregarded several pieces of exculpatory evidence going to the issue of consent: (1) M.M.'s prior sexual relationship with Collick; (2) M.M.'s statement regarding Collick's sexual performance during the assault ("Oh, I see you have stage fright."); (3) M.M.'s "suggestion to [Nurse Hatt] that she not only walked willingly to her room with Williams, . . . Scott, and Walt, but that she consented to sexual acts in her room with both Williams and Walt";[39] and (4) the absence of injuries on M.M.'s body.

This alleged exculpatory evidence does not outweigh the probable cause previously established. Despite Plaintiffs-Appellants' arguments to the contrary, a victim's previous sexual relationship with an alleged perpetrator does not have "a substantial bearing on the issue of consent."[40] As the District Court noted, a large portion of sexual assaults occur between people with a previous sexual history.[41] Just because M.M. consented to sexual activity with Collick in the past does not necessarily mean that she consented to the later sexual acts with Collick or with the *other* individuals.[42] Next,

---

[38] *Dempsey*, 834 F.3d at 479; *see also Harvard v. Cesnalis*, 973 F.3d 190, 200 (3d Cir. 2020) ("[Courts] must determine whether the plainly exculpatory evidence available to the arresting officer 'outweighs the probable cause otherwise established' through inculpatory evidence." (quoting *Dempsey*, 834 F.3d at 478, 490)).
[39] Appellants' Opening Br. at 17.
[40] *Id.* at 15.
[41] *See M.T.S.*, 609 A.2d at 1278 ("[M]ore than half of all rapes are committed by male relatives, current or former husbands, boyfriends or lovers.") (citing Diana Russell, *The Prevalence and Incidence of Forcible Rape and Attempted Rape of Females,* 7 VICTIMOLOGY 81 (1982)).
[42] *See M.T.S.*, 609 A.2d at 1277 ("[A]ny act of sexual penetration engaged in by the defendant without the affirmative and freely-given permission of the victim to the

even assuming that M.M. consented to Williams and Walt having sex with her in her dorm room because she "gave up and just laid there," this fact does not outweigh the probable cause that the earlier assault occurred.[43]  That being said, considering what occurred in her dorm room "in light of the surrounding circumstances" suggests that she did not consent to the second encounter either.[44]  In light of these same circumstances, M.M.'s comment regarding Collick's sexual performance during the assault also does not outweigh the probable cause established.  Lastly, contrary to Plaintiffs-Appellants' assertion, M.M. did have what Sergeant DeSimone believed to be injuries consistent with her version of events.  It was reasonable for Sergeant DeSimone to believe that the "abnormalities" in M.M.'s throat were a result of rough oral sex, even if at the time Nurse Hatt did not communicate that to her.  Viewed in the light most favorable to Plaintiffs-Appellants and using a totality-of-the-circumstances approach, we agree with the District Court that the alleged exculpatory evidence does not undermine a finding of probable cause.[45]

---

*specific act* of penetration constitutes the offense of sexual assault." (emphasis added)); *Cruz-Sanchez v. Rivera-Cordero*, 835 F.2d 947, 948–49 (1st Cir. 1987) ("A woman does not waive her right to refuse to have sex on one occasion by consenting to sex on a prior one, even under circumstances that some might consider unacceptable.").

[43] JA 216.

[44] *M.T.S.*, 609 A.2d at 1277; *see also United States v. Gomez-Gomez*, 547 F.3d 242, 248 (5th Cir. 2008) (en banc) ("A mere word or action indicating consent that is given under duress, whether through physical or nonphysical means, and against the free will of the victim, indicates nothing about whether the victim in fact wishes to engage in sex."), *superseded by regulation on other grounds*, *as recognized in United States v. Diaz-Corado*, 648 F.3d 290, 294 (5th Cir. 2011).

[45] *See Dempsey*, 834 F.3d at 468 ("While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer

C.

Plaintiffs-Appellants contend that the District Court failed to view all disputed facts in their favor, ignored critical facts, and relied on incorrect facts. These contentions are baseless. Plaintiffs-Appellants identify three sets of facts: (1) M.M.'s actions and comments that purportedly have "a substantial bearing on the issue of consent"; (2) deficiencies in the police investigation; and (3) certain statements by the District Court.[46]

As discussed, M.M.'s actions and comments do not outweigh the probable cause established by considering the totality of the circumstances.[47] And neither do alleged deficiencies in the police investigation, including investigative mistakes resulting from a lack of thoroughness.[48] Further, alleged deficiencies identified later, either by the PCPO

---

otherwise would have been able to consider. Instead, we view *all* such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred. Only then would the existence of conflicting evidence rise to the level of a 'genuine dispute as to any material fact' such that summary judgment would be inappropriate. Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.").

[46] Appellants' Opening Br. at 15.

[47] Plaintiffs-Appellants also argue that the District Court "viewed each [exculpatory] fact in isolation, rather than as a factor in the totality of the circumstances." Appellants' Opening Br. at 19–20 (quoting *Wesby*, 138 S. Ct. at 588). This is plainly false. The District Court explicitly conducted the probable cause analysis using a totality-of-the-circumstances approach. Indeed, it would appear that Plaintiffs-Appellants are the ones who want us to view these exculpatory facts in isolation without considering the other evidence available to Sergeant DeSimone. This we cannot do. *See* supra note 45.

[48] *See Orsatti*, 71 F.3d at 484 (probable cause analysis "focuse[s] on the information the officers had available to them, not on whether the information resulted from exemplary police work"); *Merkle*, 211 F.3d at 790 n.8 ("[An officer is] not required to undertake an exhaustive investigation in order to validate the probable cause that, in [her] mind,

15

or by Plaintiffs-Appellants' policies-and-procedures expert, also do not undermine our previous probable cause determination. As we observed in *Dempsey*: "[I]n reviewing probable cause determinations made by law enforcement, the role of the courts is not that of the much-maligned 'Monday morning quarterback' whose critiques are made possible only by the benefits of hindsight."[49]

Plaintiffs-Appellants further contend that the District Court relied on incorrect facts. Specifically, they complain that (1) the District Court incorrectly stated that "[t]his motion largely concerns the facts as reported to the police by M.M. the night of the incident, and not those developed later"; (2) the District Court incorrectly stated that Sergeant DeSimone showed M.M. photographs of plaintiffs and the other accused students and "M.M. positively identified each picture by the subject's first name"; and (3) the District Court falsely stated that "plaintiffs are not here suing M.M. for making a false complaint; they are suing the University Police for believing her[]" and that plaintiffs' position was "that the police were constitutionally required to disregard what appeared to be a credible, detailed allegation of sexual assault."[50]

The District Court's reliance on purportedly incorrect facts does not change our probable cause analysis. The fact that the initial investigation took place the afternoon after the assault, and not "the night of the incident" is irrelevant. And although M.M.

---

already existed." (citations omitted)); *Wright*, 409 F.3d at 603 ("The probable cause inquiry . . . does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate.");

[49] *Dempsey*, 834 F.3d at 469.

[50] JA 5–6.

16

identified "Termaine Scott" as "Jermaine," she positively identified the other three individuals, including Plaintiffs-Appellants. The fact that she identified one individual as "Jermaine" instead of "Termaine" does not undermine a finding of probable cause as to Plaintiffs-Appellants.[51] Finally, although Plaintiffs-Appellants disagree with the District Court's characterization of their position, even if it were incorrect, this also does not change our analysis. However, we find that the District Court's characterization of Plaintiffs-Appellants' position is accurate and not grounds to overturn the District Court's decision.

Lastly, Plaintiffs-Appellants contend that the District Court erroneously established a per se rule that "a victim's account of a sexual assault is sufficient as a matter of law to establish probable cause."[52] Not so. In *Dempsey*, we noted that, in conducting the probable cause analysis, "we . . . must bear in mind our Circuit's rule that the statements of a victim witness are typically sufficient to establish probable cause in the absence of '[i]ndependent exculpatory evidence or substantial evidence of [a] witness's own unreliability' that 'outweigh[s]' the probable cause that otherwise exists."[53] The District Court reiterated this rule, but noted that "it [would] not stop there" and went on to consider the "totality of the evidence," including evidence that corroborated M.M.'s account.[54]

---

[51] *Dempsey*, 834 F.3d at 478 ("[S]ome 'unreliability or exculpatory evidence' will not 'fatally undermine[]' probable cause otherwise established.")
[52] Appellants' Opening Br. at 26.
[53] *Dempsey*, 834 F.3d 477–78 (citations omitted).
[54] JA 17.

17

IV.

Because we conclude that Sergeant DeSimone had probable cause to arrest

Plaintiffs-Appellants, we will affirm the judgement of the District Court.[55]

---

[55] Since we conclude that the Sergeant DeSimone had probable cause to arrest Plaintiffs-Appellants, we need not address the issue of qualified immunity.